**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| JOHNNY A. RODRIGUEZ, JR., | § | |
| | § | |
| Plaintiff, | § | CIVIL ACTION NO. |
| | § | 5:26-CV-02327-OLG-ESC |
| v. | § | |
| | § | |
| CITY OF BALCONES HEIGHTS, TEXAS, et al., | § | |
| | § | |
| Defendants, | § | |

## PLAINTIFF'S SECOND AMENDED AND SUPPLEMENTAL COMPLAINT[1]

Plaintiff Johnny A. Rodriguez, Jr., the duly elected Mayor-CEO of the City of Balcones Heights, Texas, brings this Second Amended and Supplemental Complaint under 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United States Constitution. This pleading is filed with leave of Court pursuant to Fed. R. Civ. P. 15(a)(2) and, as to matters occurring after May 28, 2026, Fed. R. Civ. P. 15(d). It supersedes the First Amended Complaint [ECF 29] and reflects developments through the date of filing, including the events that have transformed this case since the First Amended Complaint was filed: the City's June 3, 2026 cease-and-desist letter threatening judicial sanctions against the Mayor for sending emails to city staff; the City's June 18, 2026 Answer, which judicially characterized the challenged restrictions as "temporary procedures" adopted "to protect the integrity of the temporary investigation"; and the events of June 22, 2026, when—at the same meeting at which the Council received the report of the personnel investigation whose pendency was the stated justification for the "temporary" restrictions—the Council majority enacted Ordinance No. 2026-17, deleting the sunset mechanism and codifying the same

[1] Filed with leave of Court pursuant to Fed. R. Civ. P. 15(a)(2) and, as to matters arising after the filing of the First Amended Complaint [ECF 29], Fed. R. Civ. P. 15(d).

restrictions as permanent law, complete with a Council-administered penalty regime of up to $500 per day, a codified gag provision, and a mechanism for branding the elected Mayor with a finding of "official misconduct in office." The City Secretary now invokes Ordinance No. 2026-17 to refuse direct communication with the Mayor, and the City Administrator has confirmed in writing that the Mayor's agenda items are "tabled until the end of litigation"—retaliation for this lawsuit, stated in so many words. The challenged ordinances are void on their face under Texas Local Government Code §§ 22.042, 22.072, and 51.012. The conduct violates the First and Fourteenth Amendments. This is a civil rights case.

## I. JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4). The action arises under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

2. This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367.

3. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b). The events giving rise to Plaintiff's claims occurred in Balcones Heights, Bexar County, Texas, within the Western District of Texas, San Antonio Division.

4. Plaintiff demands a jury trial on all issues so triable.

## II. PARTIES

### A. Plaintiff

5. Plaintiff Johnny A. Rodriguez, Jr. is the duly elected Mayor-CEO of the City of Balcones Heights, Texas, a Type A General Law municipality located in Bexar County. As Mayor-CEO, Plaintiff is vested by the Texas Legislature with mandatory statutory duties including serving

as chief executive officer, actively ensuring that all laws and ordinances of the municipality are properly carried out, inspecting the conduct of each subordinate municipal officer, and causing any negligence, carelessness, or other violation of duty to be prosecuted and punished. Tex. Loc. Gov't Code § 22.042. Plaintiff is also the presiding officer of the governing body of the municipality. *Id.* § 22.037. Plaintiff serves without monetary compensation. Plaintiff was the only candidate on the May 2, 2026 ballot for Mayor of Balcones Heights and was re-elected to office on that date.

## B. Defendants

6. Defendant City of Balcones Heights, Texas is a Type A General Law municipality organized under the laws of the State of Texas, located in Bexar County. At all relevant times, the City acted through its governing body—the City Council—which constitutes the City's final policymaking authority. The City has answered the First Amended Complaint. *See* ECF 35.

7. Defendant Jack Burton is a City Councilmember who at all times relevant to the enactment and initial enforcement of the challenged ordinances served as Mayor Pro Tem, sued in his official and individual capacities. Burton voted for and signed both Ordinance Nos. 2026-09 and 2026-11. He signed official City documents that should have borne the Mayor's signature as chief executive officer—including Resolution No. 2026-08R authorizing the personnel investigation—and operated as the gate-keeper through whom all city communications with the Mayor were routed under the regime imposed by Ordinance No. 2026-09. Burton has answered.

8. Defendant Jimmy Hernandez is a City Councilmember, Place 3, sued in his official and individual capacities. Hernandez made the motion to adopt Ordinance No. 2026-09 at the March 9, 2026 Special Called Meeting; voted for Ordinance No. 2026-11 at the March 23, 2026 Regular Meeting; moved to fast-track employment contracts for the Police Chief, City

Administrator, and City Secretary at the same March 23 meeting; and stated on the record at that meeting that the express purpose of fast-tracking those contracts was to protect those employees from the Mayor. His own admissions on the record at the March 23 meeting confirmed that direction was given in the March 9 closed session to select the investigative firm and regarding the substance of the legislative measure subsequently enacted — matters not properly noticed in the March 9 agenda. At the June 2026 Regular Meeting, Hernandez moved to table the agenda items the Mayor had placed before the Council. Hernandez has answered.

9. Defendant David Sellars served as a City Councilmember, Place 2, from 2024 until June 2026, and held that office at all times relevant to the conduct alleged against him herein. He is sued in his individual capacity and, as to conduct undertaken during his tenure, in his official capacity. Sellars seconded the motion to adopt Ordinance No. 2026-09 at the March 9, 2026 Special Called Meeting and voted for Ordinance No. 2026-11 at the March 23, 2026 Regular Meeting. At the April 27, 2026 Regular Meeting—after this action had been filed and the parties had appeared before this Court—Sellars moved a second time to remove the Mayor from office, an *ultra vires* act under Texas law. Sellars has answered.

10. Defendant Maria Hernandez is the City Administrator, sued in her official and individual capacities. Hernandez personally brought the missing-police-equipment complaint to Plaintiff's attention in February 2026, asked Plaintiff to help her hold the Police Chief accountable, and then reversed course on March 2, 2026—issuing a directive purporting to insulate the Police Chief from mayoral oversight on the same day that complaints against Plaintiff first emerged. She subsequently enforced the unlawful lockout; personally directed the Police Chief and Assistant Chief to expel Plaintiff from his March 12, 2026 developer meeting under threat of arrest; transmitted the void ordinance to city employees with isolation directives; and was permitted to

remain in the March 9 closed session from which Plaintiff was excluded. Since the filing of this action, Hernandez has unilaterally selected and engaged outside counsel (Lloyd Gosselink Rochelle & Townsend, P.C.) to "investigate" Plaintiff without any City Council resolution authorizing that firm's retention; routed Plaintiff's lawful agenda requests through Defendant Burton rather than processing them in the ordinary course; and served as the conduit through which the investigator imposed an extrajudicial confidentiality directive on Plaintiff. Under Ordinance No. 2026-17, Hernandez is now installed as the permanent, codified gate-keeper of all mayoral communications, the approving authority for the retention of special counsel to investigate elected officials, and the supervisor of any such investigation. On July 21, 2026, Hernandez confirmed in writing that the Mayor's agenda items were "tabled until the end of litigation." Hernandez has answered.

11. Defendant Cynthia Trevino is the City Attorney, sued in her official and individual capacities. Trevino personally presented undisclosed allegations against the Mayor to the Council in the March 9 closed session from which the Mayor was excluded; personally transmitted Ordinance No. 2026-09 to city employees with isolation directives; acknowledged in writing on March 10, 2026 that a procedural mistake may have been made yet directed continued enforcement; received explicit written notice on March 14, 2026 that the ordinances were void *ab initio* and that federal litigation was imminent, yet took no remedial action; and drafted Ordinance No. 2026-11 citing Texas Local Government Code § 22.072—a provision that on its own terms applies only to officers whose duties are not already specified by the Code, while § 22.042 expressly specifies the Mayor's duties. After becoming a named Defendant in this action, Trevino has continued to advise the Council majority on matters squarely adverse to Plaintiff. Under Ordinance No. 2026-17, Trevino is now installed as the codified intake point for all sworn

complaints against elected officials and the recommending authority for the retention of special counsel to investigate them. Trevino has answered.

12. At all times relevant hereto, all Defendants acted under color of state law within the meaning of 42 U.S.C. § 1983.

13. Non-party witnesses include Police Chief Roger Cavazos and Assistant Chief Robert Nelms, whose conduct on March 12, 2026—enforcing the void ordinance by threatening Plaintiff with arrest and physically confining him within a single room on city premises — is direct evidence of the City's enforcement of unconstitutional policy through sworn law enforcement officers. Cavazos and Nelms were named in the Original Complaint but are not parties to this pleading. Their conduct nonetheless remains in the case as evidence supporting Plaintiff's *Monell* claim against the City. Additional non-party witnesses include sitting Councilmembers Tracy Ebersole (Place 4) and Molly Weaver (Place 5), who voted against Ordinance No. 2026-11, voted against Ordinance No. 2026-17 and Resolution Nos. 2026-18R and 2026-19R at the June 22, 2026 meeting, and have publicly objected to the regime imposed on the Mayor, and Councilmember Juan Lecea (Place 2), who seconded the motions to adopt Resolution No. 2026-18R and Ordinance No. 2026-17, voted for both, was elected Mayor Pro Tem at the same June 22, 2026 meeting, and signed Ordinance No. 2026-17 in the Mayor's stead over a notation reading "signed by Mayor Pro-Tem due to Mayor's refusal to sign."

## III. FACTUAL BACKGROUND

### A. Statutory Authority — The Legislature Commands, the Council Cannot Prohibit

14. Plaintiff is the duly elected Mayor-CEO of the City of Balcones Heights, a small landlocked enclave city of approximately 3,296 residents located entirely within the boundaries of

San Antonio, Texas. He serves without monetary compensation. He was the only candidate on the May 2, 2026 ballot for Mayor and was re-elected to office on that date.

15. The statutory authority of the Mayor of a Type A General Law municipality flows directly and exclusively from the Texas Legislature—not from the City Council. Unlike home rule cities, which possess broad implied powers, Type A general law cities operate under the inverse principle: the council may exercise only those powers the Legislature has expressly granted. Tex. Loc. Gov't Code § 51.001.

16. The Legislature has vested in the Mayor of a Type A city mandatory duties that the Council cannot eliminate by ordinance. Section 22.042 provides:

> (a) The mayor is the chief executive officer of the municipality. The mayor shall at all times actively ensure that the laws and ordinances of the municipality are properly carried out. The mayor shall perform the duties and exercise the powers prescribed by the governing body of the municipality.
>
> (b) The mayor shall inspect the conduct of each subordinate municipal officer and shall cause any negligence, carelessness, or other violation of duty to be prosecuted and punished.

17. Tex. Loc. Gov't Code § 22.042(a)–(b). The verb "shall" appears five times in two subsections. These are mandatory commands. The Mayor cannot lawfully choose not to inspect subordinate officers; he is legally obligated to do so.

18. Section 22.072—the provision the City cites as authority for the challenged ordinances—distinguishes sharply between officers whose duties *are* prescribed by the Code and officers whose duties *are not* specified. Subsection (a) provides: "The governing body of the municipality may require a municipal officer whose duties are prescribed by this code to perform *additional* duties." Tex. Loc. Gov't Code § 22.072(a) (emphasis added). Subsection (b) provides: "The governing body may prescribe the powers and duties of a municipal officer appointed or elected to an office under this code whose duties are not specified by this code." *Id.* § 22.072(b).

19. The Mayor falls under subsection (a), not (b). His duties *are* prescribed by the Code—in § 22.042. The Council's statutory power as to the Mayor is the (a) power: to require him to perform *additional* duties beyond those the Legislature has already imposed. The Council has no statutory power to *subtract* duties the Legislature has imposed, because that power is nowhere in the Code.

20. Section 51.012, the Type A consistency provision in effect since the original 1987 enactment of the Code, provides expressly: "The municipality may adopt an ordinance, act, law, or regulation, *not inconsistent with state law*, that is necessary for the government, interest, welfare, or good order of the municipality as a body politic." Tex. Loc. Gov't Code § 51.012 (Acts 1987, 70th Leg., ch. 149, § 1, eff. Sept. 1, 1987). Section 51.012 caps Type A municipal authority—express or implied—at the consistency line. An ordinance that forbids the Mayor from performing a duty § 22.042 commands him to perform is, by definition, not consistent with state law. The Texas Legislature reinforced this longstanding consistency requirement in 2023 with the enactment of § 51.002, but § 51.012 alone is sufficient to defeat any implied-powers reading.

21. The challenged ordinances do not restrict a discretionary power; they prohibit the Mayor from performing duties the Legislature has commanded him to perform. The very text of Exhibit A to Ordinance No. 2026-09, Section (B), is captioned "*Express limitations on the powers of the Mayor*." The ordinance does not *prescribe* duties; it *proscribes* them. The Texas Local Government Code uses "prescribe" in only one direction—to add, not to subtract.

### B. Police Chief Cavazos—The Hiring, the Contract End-Run, and the Faction

22. Plaintiff hired Roger Cavazos as Police Chief of the City of Balcones Heights with the specific intention of reforming and rebuilding the police department. During the hiring process,

Cavazos was asked whether there was anything in his background that would be an embarrassment to the City; he answered no. He was also specifically asked not to engage in direct lobbying of council members; he agreed. These representations were false. The agreement at the time of hiring was clear: no employment contract would be issued immediately. With the City having just balanced its budget, Plaintiff told Cavazos to wait before seeking a contract.

23. Cavazos did not wait, and he did not keep his agreement about council lobbying. Shortly after his hiring, Cavazos began cultivating personal relationships with Councilmembers Burton, Sellars, and Jimmy Hernandez, arranged to have a formal employment contract placed on the council agenda without Plaintiff's knowledge or involvement, and lobbied the council members to approve it. The Council majority approved Cavazos a five-year employment contract with a one-year probationary period at $120,000 annually—$10,000 more than Plaintiff had intended—with exceptional benefits that no prior city employee had received. Plaintiff has since confirmed that Cavazos was terminated from a prior position at a constable's office—information not disclosed during the hiring process and directly contrary to Cavazos's representation that there was nothing embarrassing in his background.

24. As Plaintiff continued to exercise his § 22.042 oversight responsibilities—requesting operational data, seeking accountability for city resources, and evaluating departmental performance—Cavazos's resistance to that oversight became increasingly apparent. It was in this context that City Administrator Maria Hernandez began raising concerns about Cavazos's conduct directly with Plaintiff.

### C. City Administrator Hernandez Asks the Mayor to Hold the Police Chief Accountable

25. Beginning in February 2026, City Administrator Maria Hernandez—not Plaintiff—brought mounting problems with Cavazos to Plaintiff's attention. Hernandez reported that four police ticket-writing equipment units valued at approximately $12,000 in taxpayer-funded assets had gone missing under Cavazos's watch, that unexplained expenditures were occurring within the police budget, and that the department was not meeting its operational obligations. Hernandez told Plaintiff that she had been unable to hold Cavazos accountable through her own authority and asked Plaintiff to back her up in confronting Cavazos directly. Plaintiff agreed. This was the City Administrator asking the Mayor-CEO to exercise his § 22.042(b) statutory oversight authority on her behalf.

26. Acting at City Administrator Hernandez's request and pursuant to his mandatory statutory duty, Plaintiff met with Cavazos on March 3, 2026 at 3:30 p.m. in Hernandez's office, with Hernandez present. At that meeting, Hernandez presented Cavazos with a written directive in her capacity as City Administrator. Cavazos refused to sign the directive in Plaintiff's presence. He cited his five-year employment contract as his basis for non-compliance. Plaintiff then issued his own formal written directive dated March 4, 2026, addressed to both Cavazos and Hernandez, demanding an immediate investigation into the missing equipment, establishing investigation milestones, and requiring an interim report within seven working days. Cavazos did not respond. Within days, the same City Administrator who had asked Plaintiff to help her hold Cavazos accountable had reversed course entirely—and the complaints against Plaintiff had emerged.

### D. March 2, 2026—The Pivot

27. On or about March 2, 2026, two things happened simultaneously that the public record now confirms. First, City Administrator Maria Hernandez issued a directive to Police Chief Cavazos purporting to place him under her direct supervisory authority—a reversal of her prior position and an effort to insulate Cavazos from the mayoral oversight she had herself requested. Second, that same day, the City Administrator was first made aware of the complaints and allegations against Mayor Rodriguez that would become the asserted basis for the March 9 retaliatory special meeting. Resolution No. 2026-08R expressly states that "on or about March 2, 2026, the City Administrator was made aware of certain concerns, complaints and allegations from City Employees against the Mayor." The simultaneous emergence of the insulation directive and the first-known complaints on March 2 establishes that the complaint-collection process and the administrative maneuvering to protect Cavazos were coordinated from the outset. What is most telling is what Hernandez did not do: despite being in possession of these complaints against Plaintiff on March 2, 2026, she did not disclose them to Plaintiff at the March 3, 2026 meeting she had arranged with Cavazos. She sat through that meeting, watched Plaintiff confront Cavazos on her behalf, went through the motions of holding the Chief accountable, and said nothing.

28. The public record now establishes that the complaint-and-investigation machinery was in motion well before the March 2, 2026 date recited in Resolution No. 2026-08R. Billing records of City Attorney Trevino's firm—invoiced to the City on February 27, 2026 as Invoice No. 14494 and approved for payment by Defendant Maria Hernandez on March 6, 2026—reflect the following time entries by Defendant Trevino: February 19, 2026: "Attention to communication from City Manager regarding complaint received from election candidate. Evaluate related information. Begin analysis of city council rules of conduct to determine response."; February 20,

2026: "Evaluate additional documentation regarding complaint against council member. Begin analysis of code of ordinances to determine next actions."; February 23, 2026: "Communication with consultant regarding internal investigation to prepare for closed session agenda item."; and February 26, 2026: "Communication with third party consultant to negotiate engagement agreement." At the June 22, 2026 Regular Meeting, when Plaintiff inquired on the record about a "Special Ethics Project" entry in the City's finance reports, the City Attorney confirmed—as the certified minutes record—that the entry "was for the investigation of complaints against the Mayor, and that was the billing code assigned to it." On the City's own records, therefore, the analysis of a complaint "received from election candidate" during the May 2026 municipal election cycle, the preparation of a closed-session agenda item concerning an "internal investigation," and the negotiation of a third-party investigator engagement all preceded both the March 2, 2026 date on which Resolution No. 2026-08R recites the City Administrator was "made aware" of employee complaints and the Mayor's March 3–4, 2026 oversight actions that Defendants have cited as the genesis of this dispute.

### E. March 3–4, 2026—The Mayor Performs His Mandatory Statutory Duty

29. On March 3, 2026, Plaintiff met with Police Chief Cavazos and City Administrator Hernandez and personally confronted Cavazos about the missing equipment—the mandatory performance of his § 22.042(b) duty to inspect subordinate officers. Cavazos refused to comply. The following day, March 4, 2026, Plaintiff issued a formal written directive to both Cavazos and Hernandez demanding an immediate investigation into the disappearance of the four police ticket-writing equipment units. Six days after the March 3 confrontation, five days after the March 4 directive, the City Council responded by enacting an ordinance prohibiting the Mayor from

communicating with the very subordinate officers he is required by state law to inspect. The March 3 meeting and the March 4 directive also constituted speech and petitioning activity on a matter of significant public concern—stewardship of taxpayer-funded assets—protected by the First Amendment.

### F. March 9, 2026—The Special Called Meeting

30. On March 9, 2026—six days after the March 3 confrontation and five days after Plaintiff's March 4 oversight directive—the City Council held a Special Called Meeting. The publicly posted agenda did not disclose that any ordinance or resolution restricting the Mayor's powers and duties would be considered at that meeting. The agenda did not identify Mayor Rodriguez by name as the subject of any charge or complaint to be heard. Plaintiff was not informed that any action concerning his authority was being considered.

31. The Council entered closed session at 6:24 p.m. Plaintiff was excluded. Before being excluded, he was not provided with the specific allegations against him, the identity of any complainants, copies of any written complaints, the identity of any witnesses, or any of the supporting materials subsequently presented to the Council in his absence. City Administrator Maria Hernandez was permitted to remain in the closed session while Plaintiff was excluded.

32. The Council reconvened in open session at 8:37 p.m. Councilmember Hernandez moved to approve and adopt "Resolution No. 2026-07-R." Councilmember Sellars seconded the motion. The word "ordinance" was never used by any speaker during the open session. The motion passed 5-0. The certified minutes of the March 9, 2026 Special Called Meeting confirm this account.

33. The following day, March 10, 2026, City Attorney Cynthia Trevino transmitted to Plaintiff a document titled *Ordinance* No. 2026-09—not a resolution. Trevino's transmittal email

acknowledged that the motion may have been for a resolution but the document was in the form of an ordinance.

34. Ordinance No. 2026-09 purported to restrict the Mayor's powers by: (a) prohibiting any direct communication with city staff, consultants, or the City Attorney without express written City Council consent; (b) requiring all mayoral communications to be routed through Mayor Pro Tem Burton; (c) providing, in Exhibit A Section (B)(5), that "[t]he Mayor shall arrive thirty (30) minutes before council meetings are to begin and shall conclude all business and leave the meeting location within thirty (30) minutes of the conclusion of the meeting"—a provision that, as construed and enforced by Defendants through the deactivation of the Mayor's access credentials and the threat of arrest, confines the Mayor's physical presence at City Hall to those thirty-minute windows; and (d) prohibiting the Mayor from taking any adverse action against city officers or employees without City Council consent. Exhibit A to the ordinance, Section (B), is titled "*Express limitations on the powers of the Mayor*." These restrictions directly contradict §§ 22.042(a) and (b), and are therefore void under § 51.012.

35. The access bar warrants particular attention. Because council meetings are held approximately once per month, the ordinance's effect is not to limit the Mayor's access to City Hall—it is to prohibit it entirely, with a narrow monthly exception. On every ordinary working day, the elected chief executive officer of the City is not permitted to enter the building he is charged by state law with overseeing. The practical effect is *de facto* removal from office while leaving the title in place.

36. The communication ban is also a complete prohibition, not a regulation of channels. By its terms, the ordinance does not authorize the Mayor to communicate directly with any city employee, consultant, or the City Attorney by *any* means without express written City Council

consent. The purported "alternative channel" through Mayor Pro Tem Burton is not a channel of direct communication—it is a third-party intermediary controlled by one of the Council members who voted to silence the Mayor.

### G. The Physical Lockout, the Arrest Threat, and the City's Enforcement Through Sworn Law Enforcement

37. Following the passage of Ordinance No. 2026-09, Plaintiff's building entry access card was deactivated and his parking access code was deactivated. These acts—physical deactivation of the Mayor's access credentials—are not authorized by any provision of Ordinance No. 2026-09 or by any other valid legal authority. The lockout exceeded the scope of even the void ordinance itself.

38. On March 12, 2026, Plaintiff was attending a meeting with Wonderland of the Americas (WOTA) developers and investors on city premises—a meeting directly related to Plaintiff's ongoing efforts, as Mayor-CEO, to resolve the City's $5.4 million Economic Development Corporation investment. During this meeting, Defendant Maria Hernandez intervened, contacting Police Chief Roger Cavazos and directing him and Assistant Chief Robert Nelms to require Plaintiff to leave. Cavazos and Nelms appeared and informed Plaintiff he was not authorized to be on the premises, threatening him with arrest if he refused to leave. Plaintiff verbally notified them that they were enforcing a defective and illegal ordinance. His objection was disregarded. Plaintiff proceeded to a conference room on the second floor to conduct the WOTA developer meeting. In direct response, sworn law enforcement officers locked all doors to the restrooms, hallways, and administrative offices—physically confining the elected Mayor-CEO of the City within a single room and denying him access to the building's common areas. Plaintiff ultimately left the premises.

39. The meeting Defendants disrupted on March 12, 2026 was a WOTA developers and investors meeting—not a City Council meeting. Ordinance No. 2026-09 bars the Mayor from City Hall at all times, with one narrow exception: the thirty-minute windows before and after a council meeting. The arrest threat was made for being present on premises at a time when even the void ordinance's own terms did not prohibit his presence.

40. Since March 12, 2026, Plaintiff has entered City Hall on only a small number of occasions, all tied to council meetings he is statutorily required to preside over. He has not attempted to reenter at any other time because of a well-founded, objectively reasonable fear of arrest by sworn law enforcement officers acting under color of state law.

41. The conduct of Police Chief Cavazos and Assistant Chief Nelms on March 12, 2026 was conduct of the City, undertaken in their official capacities and pursuant to direction from Defendant Maria Hernandez. The conduct is direct evidence of the City's enforcement of the void ordinance through sworn law enforcement and supports Plaintiff's *Monell* claim against the City for adoption and implementation of an unconstitutional municipal policy.

### H. The Communication Ban and Employee Isolation

42. Defendants Hernandez and Trevino transmitted Ordinance No. 2026-09 to city employees with directions that all communications with the Mayor must be routed through Mayor Pro Tem Burton. All direct communications from city employees to Plaintiff ceased as a result. The Mayor no longer receives routine correspondence, notifications, or information about city operations he is statutorily required to oversee.

### I. Usurpation of Mayoral Document-Signing Authority

43. At the March 23, 2026 Regular City Council Meeting, Mayor Rodriguez was permitted to sign one proclamation. All other official City documents from that meeting—

ordinances, resolutions, contracts, and instruments—that would ordinarily require the Mayor's signature were instead signed by Mayor Pro Tem Jack Burton with Burton's signature block substituted for the Mayor's. Resolution No. 2026-08R—the resolution authorizing the personnel investigation into the Mayor himself—was signed by Burton. No valid ordinance or provision of state law authorizes this substitution.

### J. March 23, 2026—The Council Doubles Down and Secures the Faction

44. At the March 23, 2026 Regular City Council Meeting, the Council majority passed Ordinance No. 2026-11, which purported to "ratify" Ordinance No. 2026-09 and impose additional restrictions. The Council simultaneously enacted Resolution No. 2026-08R authorizing an investigation by "The Austin Institute, LLC"—signed by Burton, not Rodriguez. The Austin Institute, LLC has held a status of Forfeited Existence with the Texas Secretary of State since 2020 and was incapable of accepting the engagement.

45. Ordinance No. 2026-11 is independently void for multiple reasons. First, a void act cannot be ratified. Second, the ordinance's own recitals cite Texas Local Government Code § 22.072 as authority—but § 22.072(b) applies only to officers "whose duties are not specified by this code," and § 22.042 expressly specifies the Mayor's duties. Third, Ordinance No. 2026-11 is subject to the same TOMA notice deficiencies as its predecessor.

46. Ordinance No. 2026-11 contains an additional, independently dispositive defect: its operative term. Section 3 of Ordinance No. 2026-11—captioned, in the ordinance's own text, "TEMPORARY RESTRICTIONS"—provides that the limitations "shall remain in effect during the third-party investigation into the complaints and allegations against the Mayor is completed [sic] *or further order of the City Council, whichever occurs last*." The phrase "whichever occurs

last" is dispositive. The restrictions do not lift automatically upon completion of the investigation. They continue until the Council majority that imposed them affirmatively votes to lift them. Defendants have repeatedly characterized the restrictions as "temporary"—a characterization the Council wrote into the ordinance's own caption. They are not. The restrictions are indefinite by the ordinance's own terms—and, as pled below, the Council eliminated even that illusory endpoint on June 22, 2026, by codifying the restrictions as permanent law in Ordinance No. 2026-17.

47. At the same March 23, 2026 meeting where the Council passed Ordinance No. 2026-11—stripping the Mayor's oversight authority for the second time—the Council also voted to waive the probationary period and fast-track employment contracts for Police Chief Cavazos, City Administrator Hernandez, and City Secretary Bravo. Councilmember Jimmy Hernandez stated on the record, in the open session of that meeting, that the express purpose of fast-tracking these contracts was to protect those employees from the Mayor—to ensure that if any of them were to be terminated, it would require a council majority vote rather than being "left to one individual." That admission is direct evidence of retaliatory motive in the words of one of the Defendants.

48. At the same March 23 meeting, Councilmember Jimmy Hernandez acknowledged on the record that direction had been given in the March 9 closed session regarding the substance of the legislative measure subsequently enacted and the selection of the investigative firm—matters not properly noticed in the March 9 agenda. The closed session had been cited in part to Texas Government Code § 551.072(2), a real-property provision, for deliberations having nothing to do with real property.

## K. The Lloyd Gosselink "Investigation"—No Council Authorization, Defendant-Directed Selection, and the Extrajudicial Gag Order

49. Resolution No. 2026-08R, approved at the March 23 meeting, purported to retain "The Austin Institute, LLC" to conduct the personnel investigation. As pled above, The Austin Institute, LLC has held a Forfeited Existence status with the Texas Secretary of State since 2020 and was incapable of accepting the engagement.

50. Without further Council resolution, ordinance, or other action authorizing the retention of a substitute firm, Defendant Maria Hernandez engaged Lloyd Gosselink Rochelle & Townsend, P.C. to conduct the investigation. No City Council resolution authorizes Lloyd Gosselink's retention. No certified minutes record a Council vote on the retention. No engagement letter has been disclosed. Plaintiff has, through counsel, demanded production of these materials; the demands were not honored. Most recently, on May 26, 2026, Plaintiff demanded production of "a copy of the council resolution, ordinance, or other action authorizing Lloyd Gosselink Rochelle & Townsend's retention; certified minutes and the recording vote; engagement letter and any amendments; and identification of who within the city directed and approved retention of their services." As of the filing of the First Amended Complaint, that demand had not been honored.

51. On April 22, 2026, Laura Ingram of Lloyd Gosselink transmitted to Plaintiff an interview request. That communication imposed on Plaintiff a written directive purporting to forbid him from "discuss[ing] the City's investigation of him with anyone other than his attorney." That is an extrajudicial confidentiality directive imposed on a sitting elected officeholder on a matter of significant public concern, without notice, hearing, or any judicial determination.

52. Plaintiff, through counsel, responded by requesting basic procedural information about the investigation—the scope, the authorizing instrument, the identity of complainants, the

evidentiary basis, and the procedural safeguards—and conditioning Plaintiff's cooperation on the provision of that information. The investigator declined to coordinate through normal channels, refused to provide the requested information, and continued to insist on Plaintiff's interview without disclosing the basis or scope of the inquiry. The exchanges continued through at least May 14, 2026. As of the filing of the First Amended Complaint on May 28, 2026, Plaintiff had not been interviewed; no report had been issued to the Council; and the investigation's scope and authorization remained undisclosed to Plaintiff. Plaintiff was never interviewed at any point before the investigation concluded. As pled below, the investigation's executive summary report is dated June 4, 2026, and was received by the Council on June 22, 2026—the same day the Council made the "temporary" restrictions permanent.

### L. April 27, 2026—Post-Filing Retaliation Continues

53. On April 27, 2026, the City Council convened in regular session. At that meeting, with the federal lawsuit pending and after the parties had already begun briefing the preliminary-injunction motion, Defendant Sellars moved a second time to remove Plaintiff from office. Texas law does not authorize the Council to remove an elected official. *State ex rel. Angelini v. Hardberger*, 932 S.W.2d 489, 490 (Tex. 1996); Tex. Civ. Prac. & Rem. Code § 66.002. The motion was *ultra vires* on its face. Councilmembers Ebersole and Weaver broke quorum in protest, terminating the meeting before further action could be taken.

54. At and around the April 27, 2026 meeting, Defendant Trevino—who had by that date been a named Defendant in this lawsuit for approximately nineteen days—continued to advise the Council majority on matters squarely adverse to Plaintiff. Defendant Trevino communicated with at least one councilmember about the federal litigation in terms reflecting that she was acting

both as a defendant herself and as the lawyer providing advice to the Council majority on the same litigation, in disregard of her own conflict of interest.

55. Laura Ingram of Lloyd Gosselink appeared at or in connection with the April 27, 2026 meeting in her purported capacity as outside investigator. The Council had not, before April 27 or at the April 27 meeting itself, adopted any resolution specifically authorizing Lloyd Gosselink's retention. The executive-session notice for the April 27 meeting was itself defective under TOMA: the citation to consultation-with-attorney privileges did not properly notice deliberations on the substantive findings of the investigation, and Defendant Trevino—who was herself a named Defendant in the federal litigation by April 27—nonetheless participated in the closed-session discussions.

### M. May 3, 2026—Ex Parte Contact with the Represented Plaintiff

56. On May 3, 2026—the day after Plaintiff was re-elected to the office of Mayor with no opposition—Defendant Jimmy Hernandez transmitted to Plaintiff a personal email styled as an "olive branch," in which Defendant Hernandez proposed direct communication and reconciliation outside the channels established by the very ordinances Defendant Hernandez had voted for. The communication was *ex parte* contact with a represented party in pending federal litigation. Plaintiff did not respond and forwarded the communication to counsel.

### N. May 7–13, 2026—The Agenda Suppression

57. On May 7, 2026, Plaintiff emailed City Secretary Joe Bravo requesting confirmation of the deadline for placement of items on the agenda for the May 18, 2026 Regular City Council Meeting. Plaintiff is the elected presiding officer of the governing body. Tex. Loc. Gov't Code § 22.037(b)(2). He has a statutory and First Amendment right to place lawful items on the agenda of the body over which he presides.

58. On Monday, May 11, 2026 at 1:47 p.m., Plaintiff transmitted to City Secretary Joe Bravo (with Defendant Burton copied) his agenda submissions for the May 18, 2026 meeting. The submissions included twelve agenda items, each labeled “Discussion and action” and falling within the Mayor’s statutory and constituent-representation responsibilities, including: an update on a $250,000 federal grant for a senior citizens community center awarded through Congressman Joaquin Castro; concerns within the Balcones Heights Police Department, including employee pay equity, disciplinary procedures, and ongoing internal reviews; the Balcones Heights Police Collective Bargaining Agreement; the Gentleman Road Hike and Bicycle Lane Project; the Fiscal Year 2026–2027 City Budget and a department-by-department report on authorized positions, salaries, and pay raises; emergency preparedness planning; police reserve officer policies; the waiver of city fees and permit requirements; a financial accounting of the Balcones Heights Tejano Music Fest; Rogiers Park improvements; the development of an online public transparency portal; and, as Item 10, “a complaint concerning the use of hotel occupancy tax (HOT) and or City Funds allocated to the Balcones Heights Tejano Music Fest for the purpose of securing and operating a vendor booth used to promote the political campaigns of Jack Burton, mayor pro tem and council candidate Juan Lecea during the City of Balcones Heights May 2, 2026 early voting period and general election cycle.”

59. Mr. Bravo did not respond to Plaintiff. At 2:12 p.m. on the same day, Mr. Bravo forwarded Plaintiff’s submissions to Defendant Maria Hernandez. At 4:24 p.m. on the same day, Defendant Maria Hernandez routed her substantive reply to Plaintiff through Defendant Burton—the same Mayor Pro Tem who voted for the void ordinances and who functions as the operational gate-keeper for all communications with Plaintiff under the regime imposed by Ordinance No. 2026-09. At 5:25 p.m., Defendant Burton forwarded Defendant Hernandez’s reply to Plaintiff.

Defendant Hernandez's reply asserted that Plaintiff's submissions were untimely under "Ordinance 2019-02 council relations Policy and code of ethics, Section V. City Council Meeting Information B.2.c," a six-business-day pre-meeting deadline applicable to councilmember submissions. The reply offered to add Plaintiff's items to the June council meeting agenda.

60. Among the twelve agenda items suppressed was a constituent complaint concerning Defendant Burton's and at least one other elected official's use of municipal Hotel Occupancy Tax ("HOT") funds and/or other city funds for a vendor booth at City Hall during the May 2, 2026 municipal election in support of Defendant Burton's and another candidate's re-election campaigns. Defendant Burton was therefore inserted, via the very communication regime he voted to enact, as the intermediary controlling whether and when a constituent complaint about Defendant Burton's own conduct would be heard by the governing body. That is not a content-neutral regulation. It is the regime operating precisely as Plaintiff has alleged it was designed to operate: as a viewpoint-discriminatory restraint on the Mayor's protected speech in the body over which he presides, administered by the political adversaries the speech was directed at.

### O. May 18, 2026—Meeting Cancellation, Fire Emergency Notification Failure

61. The regularly scheduled May 25, 2026 City Council meeting was rescheduled to May 18, 2026 without any Council resolution or governing-body authorization that has been disclosed to Plaintiff.

62. The May 18, 2026 meeting was canceled for asserted lack of quorum. Mayor Rodriguez was not notified of the cancellation by the City Secretary, the City Administrator, the Mayor Pro Tem, or any other City official. He learned of the cancellation from another councilmember at approximately 5:30 p.m. that evening, shortly before the scheduled meeting

time. The cancellation was effected by the City Secretary unilaterally. The City Secretary has no statutory authority to cancel a meeting of the governing body. Tex. Loc. Gov't Code § 22.038.

63. On the same evening of May 18, 2026, the Balcones Heights Fire Department responded to a residential structure fire in the 200 block of Bobbies Lane. Mayor Rodriguez was not notified of the emergency by City Administration, Fire leadership, Police personnel, or any other City official. He learned of the emergency from a constituent. Upon arriving at the scene, the Mayor observed that the City Administrator, the City's Community Engagement Manager, and at least one councilmember were already present. The Mayor personally assisted the displaced homeowner in contacting his insurance carrier and securing emergency housing, in the absence of any apparent City response to the homeowner's immediate needs. The City's subsequent official Facebook post regarding the fire acknowledged mutual-aid partners and the Balcones Heights Police Department but did not acknowledge the elected Mayor.

64. Defendant Burton's absence from the May 18, 2026 meeting was, on information and belief, the cause of the lack of quorum that triggered the cancellation. Defendant Burton was, however, publicly active on social media on May 18, 2026—including by publicly commenting on the City of Balcones Heights' official Facebook post regarding the residential fire—in a manner inconsistent with any asserted incapacity to attend the meeting.

### P. May 26, 2026—The EDC Notification Failure

65. On May 26, 2026, Plaintiff inquired of City Secretary Joe Bravo whether anyone had communicated with him regarding the June 11, 2026 Economic Development Corporation meeting, its attendance, or its agenda. Mr. Bravo did not respond directly to Plaintiff. Instead, Mr. Bravo forwarded the Mayor's inquiry to Defendant Burton, who forwarded Mr. Bravo's substantive response to Plaintiff. The response disclosed for the first time that the EDC Chair

(Roger Enriquez) had requested member attendance confirmation, had attached a Memorandum of Understanding for consideration, and had set the meeting for June 11, 2026—information that was not communicated to the Mayor in advance through any direct channel. Plaintiff's contemporaneous response captured the substance: "but for my inquiry, I would never have known about the existence of this meeting, why is that??" The exchange demonstrates that the routing-through-Burton regime is now operating not only to suppress the Mayor's *outgoing* speech but to suppress the Mayor's *incoming* official information—a complete informational quarantine.

### Q. Indefinite Duration and Ongoing Harm

66. As pled above, Ordinance No. 2026-11 provides on its face that the restrictions remain in effect "during the third-party investigation into the complaints and allegations against the Mayor is completed [sic] or further order of the City Council, whichever occurs last." The same Council majority that enacted the restriction is also responsible for the "further order" termination trigger. More than four months after the enactment of Ordinance No. 2026-09 and Ordinance No. 2026-11, the lockout, communication ban, document-signing usurpation, and access deactivations remain fully in effect—and have now been codified as permanent law by Ordinance No. 2026-17, as pled below.

67. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer: (a) complete exclusion from City Hall and municipal facilities due to reasonable fear of arrest; (b) inability to communicate directly with city staff, the City Attorney, or city consultants in performance of statutory duties; (c) inability to retrieve official mail or access official correspondence; (d) usurpation of his document-signing authority as chief executive officer; (e) severe reputational harm from the public nature of the retaliatory conduct; (f) emotional distress, mental anguish, humiliation, and dignitary harm; (g) ongoing deprivation of the citizens

of Balcones Heights of the effective governance of their duly elected Mayor-CEO; (h) inability to manage or oversee implementation of a $250,000 federal grant awarded to the City of Balcones Heights through the office of Congressman Joaquin Castro for a senior citizens community center; (i) cancellation of at least one scheduled EDC meeting due to Plaintiff's inability to attend as a direct consequence of the ongoing lockout; (j) suppression of the Mayor's lawful agenda submissions and the routing of agenda decisions through a political adversary; (k) the imposition of an extrajudicial confidentiality directive purporting to forbid the Mayor from speaking publicly about the very investigation his political opponents have initiated against him; and (l) the systematic withholding of incoming information about official municipal events from the Mayor.

### R. June 3, 2026—The City Threatens the Mayor with Judicial Sanctions for Emailing City Staff

68. On June 3, 2026, counsel for the City Defendants transmitted to Plaintiff's counsel a formal cease-and-desist letter captioned "Cease and Desist—Continued Violations of Ordinance 2026-11 by Your Client, Johnny Rodriguez, Jr." The letter asserted that between May 6, 2026 and June 2, 2026, Plaintiff had sent "at least thirty-four (34) emails directly to City Staff, in violation of Ordinance 2026-11," attached copies of the thirty-four emails, and demanded that Plaintiff "immediately cease and desist all conduct that violates Ordinance 2026-11," including "[s]ending direct email communications to City Staff without the express written consent of the City Council" and "[c]ommunicating verbally with City Staff without the express written consent of the City Council." The letter demanded written confirmation of compliance by end of business on Friday, June 5, 2026, and stated that "[c]ontinued noncompliance will require the City of Balcones Heights to seek judicial enforcement and / or sanctions, and all other available remedies under the law."

69. The June 3, 2026 cease-and-desist letter confirms three facts. First, the City is actively enforcing the communication ban against the Mayor's routine performance of his office—the thirty-four "violations" the City catalogued are, on the City's own account, emails from the elected Mayor to city staff about city business. Second, the enforcement mechanism is the threat of judicial sanction against the Mayor personally. Third, the City's position is that the elected chief executive officer of the municipality requires "the express written consent of the City Council" before he may speak—by any means—to any employee of the city he is statutorily commanded to oversee.

### S. June 18, 2026—The City's Answer Rests the Entire Defense on the "Temporary" Premise

70. On June 18, 2026, the City Defendants answered the First Amended Complaint. ECF 35. The Answer admits that City Administrator Maria Hernandez was permitted to remain in the March 9, 2026 executive session from which the Mayor was excluded. The Answer characterizes the challenged restrictions as "the temporary procedures enacted in the Ordinances," and asserts that "to ensure a full and fair third-party investigation," the "Council adopted the ordinances at issue, to protect the integrity of the temporary investigation . . . pending the outcome of the third-party investigation." ECF 35 ¶¶ 91, 93.

71. The Answer further asserts: "as of the date of this filing, the third-party investigation has concluded, and its findings will be presented to City Council at the next meeting." ECF 35 ¶ 92. On the City's own pleaded justification, therefore, the restrictions existed to protect a pending investigation—and that justification expired, by the City's own admission, no later than June 18, 2026, when the investigation concluded. What the Council did four days later, at "the next meeting," is pled in the following section.

### T. June 22, 2026 — The Investigation Concludes and, the Same Day, the Council Makes the Restrictions Permanent

72. On June 22, 2026, the City Council held its Regular Meeting. At that meeting, the Council received the report of the personnel investigation concerning the Mayor—the investigation whose pendency had been, in the City's own filings and representations to this Court, the sole asserted justification for the "temporary" restrictions imposed by Ordinance Nos. 2026-09 and 2026-11.

73. Before the June 22, 2026 meeting, Plaintiff, through counsel, delivered to counsel for the City Defendants a written demand pursuant to Texas Government Code § 551.074(b) that the agenda item concerning the personnel investigation report—which had been posted for closed session under the consultation-with-attorney provision, Tex. Gov't Code § 551.071, rather than the personnel provision, § 551.074—be heard in open session. Section 551.074(b) provides that the personnel exception "does not apply if the officer or employee who is the subject of the deliberation or hearing requests a public hearing."

74. At the June 22, 2026 meeting, the Council entered closed session at 6:17 p.m. for what the certified minutes describe as "attorney consultation and an update on Mayor Rodriguez v City of Balcones Heights." Before the Council entered closed session, Defendant Jimmy Hernandez moved to exclude Mayor Rodriguez from the closed session "due to interests being averse to the City of Balcones Heights." The motion passed 3–2—Councilmembers Burton, Lecea, and Hernandez in favor; Councilmembers Ebersole and Weaver opposed. The elected presiding officer of the governing body was thus excluded, by vote of the three-member majority, from the closed session at which the matters that consumed the balance of the meeting were addressed.

75. The Council reconvened in open session at 7:20 p.m. and took up, as its first item of business, "Discussion and possible ACTION regarding results of the investigation." On the motion of Defendant Jimmy Hernandez, seconded by Councilmember Lecea, the Council adopted Resolution No. 2026-18R, "accepting report and findings and authorizing issuance of corrective action, if necessary," by a 3–2 vote—Councilmembers Burton, Lecea, and Hernandez in favor; Councilmembers Ebersole and Weaver opposed. Asked what the process for hiring the investigator had been, the City Administrator explained, per the minutes, that "the investigator was recommended by TML"—identifying no Council resolution or other authorizing action for the Lloyd Gosselink retention.

76. At the same June 22, 2026 meeting—the very meeting at which the investigation whose pendency justified the "temporary" restrictions was concluded—the Council majority enacted Ordinance No. 2026-17, styled "An Ordinance of the City of Balcones Heights, Texas Establishing Uniform Standards of Conduct for All Elected Officials." The motion to approve was made by Defendant Jimmy Hernandez and seconded by Councilmember Lecea, and the ordinance passed 3–2: Councilmembers Burton, Lecea, and Hernandez in favor; Councilmembers Ebersole and Weaver opposed. The certified minutes record "discussion about Council members not being able to read this Ordinance prior to Executive Session," which the minutes attribute to "its relation to the ongoing legal case." Mayor Rodriguez refused to sign the ordinance. It was signed instead by Councilmember Lecea — elected Mayor Pro Tem at the same meeting by the same 3–2 majority—over a notation on the face of the ordinance reading: "signed by Mayor Pro-Tem due to Mayor's refusal to sign."

77. The investigation report received on June 22, 2026 is an "Executive Summary" memorandum dated June 4, 2026, authored by Laura Ingram of Lloyd Gosselink and addressed to

the City "THRU: Maria Hernandez, City Administrator"—a named Defendant in this action. On its face, the report rests on written complaints, staff witness interviews, recordings, and documents; it does not reflect, and could not reflect, any interview of the Mayor, because the Mayor was never interviewed. Among the "[a]llegations of such threats, fear, and retaliation" the report catalogs against the Mayor is this: "The Mayor filed a lawsuit and sought corrective action against City officials following their reporting complaints about his behavior." The City's own commissioned investigation thus expressly counts Plaintiff's filing of this federal civil rights action—constitutionally protected petitioning activity—as conduct substantiating a finding of misconduct against him. The report's "interference" findings likewise condemn the Mayor for directing or attempting to direct personnel actions, involving himself in police department operational matters, and appearing on site during police incidents—that is, for performing the inspection and oversight functions that Tex. Loc. Gov't Code § 22.042 commands the Mayor to perform.

78. Also on June 22, 2026—on the motion of Defendant Jimmy Hernandez, seconded by Defendant Burton, by the same 3–2 vote—the Council adopted Resolution No. 2026-19R, selectively waiving the attorney-client privilege as to the executive summary, and, per the certified minutes, "City staff were directed to post the investigation report on the city's website." The City thereby armed itself to publicize its accusations against the Mayor—the report was directed to the City's own website, and a redacted version was subsequently provided to the press—while the underlying "privileged report," witness interviews, complaints, and supporting materials remain withheld, and while the Mayor remained subject to the April 22, 2026 confidentiality directive and, as of the same June 22 meeting, to the codified gag provision of Ordinance No. 2026-17 § 2.6(A)(11). The City may publish its accusations; the accused elected official is forbidden to respond.

79. The June 22, 2026 meeting produced a series of companion measures that complete the structural picture. Ordinance No. 2026-16 (adopted 3–1, Councilmember Ebersole opposed) rewrote the City's administrator-succession policy to provide that the Police Chief—and failing him, the Fire Chief or the Community Development Director—shall perform the duties of an absent City Administrator, and that "[i]n no event will the Mayor or a City Council Member be appointed to temporarily fill the position of the City Administrator or perform the duties of the City Administrator"—repealing the prior policy under which the Mayor temporarily filled that role, over the Mayor's on-the-record objection that reallocating municipal administration away from the elected mayor requires an election under Chapter 25 of the Texas Local Government Code. Resolution No. 2026-17R (adopted 4–0) authorized Police Chief Cavazos to conduct a security assessment of the Justice Center, designate secured and restricted areas, control access credentials, and serve as "the primary authority to approve, deny or limit access to the Facility"—vesting control over the Mayor's physical access to city facilities in the very subordinate officer whose oversight by the Mayor precipitated this dispute. And the Council approved (4–0) a two-year extension, through May 31, 2028, of the City's lease of "Space A-47 (Mayor's Office/Annex)" at the Wonderland of the Americas Mall—the mall office to which Ordinance No. 2026-17 § 2.5(C)(6) assigns the Mayor's routine City business—with Defendant Burton asking the Mayor whether he "still wanted the office."

80. Finally, at the same June 22, 2026 meeting, Defendant Jimmy Hernandez moved "to table items 15, 18, 21, 22, 23, 24, 25, 26, 27, 29, 30, 31, and 32 until the litigation between the Mayor and the City has been completed." Defendant Burton seconded the motion, and it passed 3–1—Councilmembers Burton, Lecea, and Hernandez in favor; Councilmember Ebersole opposed. Every one of the thirteen tabled items had been placed on the agenda by the Mayor. When

the Mayor went item by item asking whether the motion truly extended to each, Defendant Hernandez, per the certified minutes, "clarified he had no intention of changing his motion and that each item was relevant to the Mayor's lawsuit and would therefore need to be tabled." By formal act of the Council majority, recorded in the certified minutes, the Mayor's legislative agenda—the City budget, a $250,000 federal grant, the police collective bargaining agreement, and a review of the City's conflicted legal representation among them—was frozen for the express reason that the Mayor has petitioned this Court.

81. Ordinance No. 2026-17 contains no sunset clause, no termination trigger, and no temporal limitation of any kind. Section 8 makes it "effective immediately upon passage and publication." Section 3 repeals and supersedes any conflicting provisions of prior ordinances. Where Ordinance No. 2026-11 at least purported to tether its restrictions to the pendency of the investigation, Ordinance No. 2026-17 severs that tether entirely: it re-enacts the same restrictive architecture as permanent, codified municipal law, directs the City Secretary to record and publish it in the City's Code of Ordinances, and adds a Council-administered penalty and adjudication regime that did not previously exist.

82. The sequence is the pretext, laid bare in the public record. The City stipulated and represented to this Court that the restrictions were "temporary" measures protecting a pending investigation. The City's Answer, filed June 18, 2026, repeated that characterization and announced the investigation's conclusion. Four days later, on the same day the Council received the investigation report—the day the "temporary" justification expired by its own terms—the Council majority enacted the same restrictions as permanent law, and, by separate formal vote at the same meeting, froze thirteen of the Mayor's agenda items "until the litigation between the

Mayor and the City has been completed." The restrictions were never about the investigation. They were, and are, about permanently disabling the elected Mayor.

### U. Ordinance No. 2026-17's Operative Provisions—The Permanent Regime

83. *The Defendant-gatekeeper communication regime.* Section 2.5(A)(1) of Ordinance No. 2026-17 requires that elected officials "communicate operational requests, personnel concerns, and administrative matters through the City Administrator"—Defendant Maria Hernandez, a named Defendant in this action and one of the complainants-in-interest in the campaign against the Mayor. Section 2.5(A)(3) provides that elected officials "may not request information directly from a City Staff member unless authorized by the City Administrator or City Council," and that all requests for information "must be submitted to the City Administrator, in writing." Section 2.5(C)(3) provides that the Mayor "shall not request and cannot obtain an in-person meeting with any City Staff member to discuss City business without the express written authorization of the City Administrator or City Council," and that the City Administrator "may be present during any such communications or meetings and may place reasonable restrictions or procedures in place."

84. *The redefinition of the Mayor's statutory duty.* Section 2.5(C)(2) provides that the Mayor "does not have the unilateral power to take adverse action, including discipline actions of any kind against Municipal Officers or employees of the City," and that the Mayor "shall recommend to the City Administrator or City Council that action be taken," declaring that "[s]uch recommendation constitutes the Mayor causing any negligence, carelessness, or other violation to be prosecuted or punished." By this provision, the Council purports to legislatively redefine the mandatory duty imposed on the Mayor by Tex. Loc. Gov't Code § 22.042(b)—reducing the

statutory command that the Mayor "shall cause any negligence, carelessness, or other violation of duty to be prosecuted and punished" to the making of a recommendation to Defendant Maria Hernandez, a subordinate municipal officer who is herself subject to the Mayor's § 22.042(b) inspection duty.

85. *The banishment of the Mayor from City Hall.* Section 2.5(C)(6) provides: "For routine City business, the Mayor shall conduct his duties at the office established for use by the Mayor at the Wonderland of the America's mall. For presiding officer tasks, the Mayor shall conduct such duties at the location of a properly called public meeting." By permanent ordinance, the elected chief executive officer of the City of Balcones Heights is assigned to conduct the business of his office not at City Hall, but at a shopping mall. Sections 2.5(A)(5)–(7) separately prohibit elected officials from entering "the secured areas of any city facility" without "proper and current security access" and without an escort "assigned by either the Chief of Police or the City Administrator or their designees"—while the Mayor's access credentials remain deactivated.

86. *The document-signing regime.* Section 2.5(C)(5) provides that the Mayor "may sign contracts, ordinances, resolutions, and other documents authorized by the City Council" only "at the close of any council meeting or at a mutually convenient time and place for the Mayor and the City Administrator"—subordinating the chief executive officer's signing function to the schedule and convenience of a subordinate officer who is a Defendant in this action.

87. *The complaint-and-investigation machinery, run by the Defendants.* Section 2.6 establishes a permanent mechanism for the investigation of elected officials. Sworn complaints "shall be submitted to the City Attorney"—Defendant Trevino. Special counsel to investigate is "recommend[ed]" by the City Attorney "with City Administrator approval"—Defendants Trevino and Maria Hernandez. The special counsel operates "under the supervision of the City

Administrator"—Defendant Maria Hernandez, § 2.6(A)(7). The subject official receives the complaint only "[u]pon initiating an investigation," § 2.6(A)(8). The City Council—the accused official's political adversaries—then "determine[s] whether the alleged misconduct constitutes a violation," § 2.6(A)(12), while "[t]he Elected Official accused of a violation shall not participate in any City Council deliberations or votes related to the complaint," § 2.6(A)(13). A hearing is optional: the Council "may, but is not required to, hold a hearing." § 2.6(A)(12).

88. *The codified gag order.* Section 2.6(A)(11) provides that "[t]he complaint, any response, and the investigation shall be confidential" and "cannot be discussed outside of a closed session by any person other than the City Attorney and special counsel." The extrajudicial confidentiality directive that Lloyd Gosselink imposed on the Mayor on April 22, 2026—challenged in this action as an unconstitutional prior restraint—has now been enacted as permanent municipal law, forbidding the accused elected official from speaking about the investigation of himself, on pain of the penalty regime described below, while the City Attorney and the Council-selected special counsel retain the exclusive right to speak.

89. *The penalty regime and the "official misconduct" brand.* Section 2.6(A)(12) provides that if the Council determines a violation was intentional, "the violation shall constitute official misconduct in office." Section 2.7(A) empowers the Council, upon finding a violation, to: impose "fines up to $500.00 per violation," with "[a] separate violation occur[ring] each day and for each instance of misconduct"; "[o]rder restricted access to City Staff and City facilities which are more stringent than any restrictions under this Code"; issue formal written sanctions; rescind appointments; and "[r]equire the violator to pay any attorney's fees incurred by the City and associated with charges by special counsel." Section 2.7(B) authorizes the Council to declare complaints "frivolous" and impose penalties on complainants—chilling the very citizens who

might complain about the Council majority itself. Section 2.8 limits judicial review of the Council's final determination to a substantial-evidence appeal in Bexar County district court.

90. *The circumvention prohibition.* Section 2.5(A)(9) provides that "[n]o Elected Official can utilize an intermediary to intentionally or knowingly circumvent the requirements of this Code" — a provision that, applied to the facts of this case, purports to make it a sanctionable offense for the Mayor to communicate with his own city government through anyone other than Defendant Maria Hernandez.

## V. Ordinance No. 2026-17 Is Void for the Same Reasons as Its Predecessors—and New Ones

91. Ordinance No. 2026-17 suffers every structural defect pled above as to Ordinance Nos. 2026-09 and 2026-11, and adds new ones. First, it directly conflicts with Tex. Loc. Gov't Code § 22.042(a)–(b). The Mayor's mandatory duty to "inspect the conduct of each subordinate municipal officer" extends to the City Administrator herself; an ordinance that makes the City Administrator the mandatory gatekeeper, approving authority, and supervisor of all channels through which the Mayor may perform that inspection inverts the statute. The officer to be inspected cannot lawfully be made the licensor of the inspection.

92. Second, Ordinance No. 2026-17 exceeds the Council's power under Tex. Loc. Gov't Code § 22.072. The Mayor's duties are specified by the Code, in § 22.042; the Council's only power as to such an officer is to require *additional* duties, § 22.072(a). Ordinance No. 2026-17 does the opposite: it subtracts, conditions, and redefines the duties the Legislature imposed—including by declaring that a mere recommendation to the City Administrator "constitutes" the discharge of the Mayor's § 22.042(b) duty to cause violations to be prosecuted and punished.

93. Third, Ordinance No. 2026-17 exceeds the § 51.012 consistency cap. A Type A general law municipality may adopt only ordinances "not inconsistent with state law." An ordinance that forbids what the statute commands—direct inspection of subordinate officers—and commands what the statute does not permit—the routing of the chief executive's statutory functions through a subordinate officer's discretion—is inconsistent with state law and void.

94. Fourth, the penalty and adjudication regime of §§ 2.6–2.8 constructs a Council-administered removal-and-punishment mechanism that Texas law does not authorize. Texas law provides an exclusive judicial mechanism for the removal of an elected municipal officer. Ordinance No. 2026-17 empowers the Council majority to adjudicate its political adversary guilty of "official misconduct in office," fine him $500 per day, strip his access to city staff and facilities beyond even the ordinance's baseline restrictions, and tax him with the City's attorney's fees—accomplishing by municipal ordinance the functional equivalent of removal and punishment that the Legislature reserved to the courts.

95. Fifth, the ordinance's recital that elected officials' statutory duties "are subject to the imposition of procedures and safeguards" concedes the point: the Council's own enactment acknowledges that it is regulating—in practice, obstructing—duties imposed by state statute, which a Type A municipality has no power to do.

96. Sixth, the cumulative architecture of the ordinances collides with Chapter 25 of the Texas Local Government Code. The Legislature has provided a single mechanism by which a general-law municipality may vest its administration in an appointed executive superior in function to the elected mayor: adoption of the city-manager form of government by the municipality's voters at an election held for that purpose. A municipality may employ a city administrator without such an election—but what it may not do is accomplish by ordinance the reallocation the

Legislature reserved to the voters: the subordination of the elected chief executive officer's statutory functions to an appointed administrator's discretion and supervision. Ordinance No. 2026-17 installs Defendant Maria Hernandez as the mandatory gatekeeper of the Mayor's communications, the licensing authority for his meetings with staff, the supervisor of investigations of him, and the officer to whose convenience his document-signing function is subordinated; Ordinance No. 2026-16 simultaneously bars the Mayor—alone among conceivable officers—from even temporarily performing administrative duties. The voters of Balcones Heights have never been asked, as Chapter 25 requires, whether they wish their city administered by an appointee rather than by their elected Mayor-CEO. The Mayor raised this objection on the record at the June 22, 2026 meeting; the majority enacted the measures anyway.

### W. July 2026—Ordinance No. 2026-17 in Operation: The Litigation-Based Agenda Freeze

97. Ordinance No. 2026-17 is not dormant text. It is being enforced against the Mayor now. On July 17, 2026, City Secretary Joe Bravo transmitted to the Mayor the draft agenda for the July 27, 2026 Regular Meeting with the following statement: "The aforementioned electronic communication is being initiated to provide the attached agenda. *Any further communication should be communicated through the city administrator, Maria Hernandez as per enacted city ordinance 2026-17*." The City Secretary—the officer statutorily responsible for preparing and posting the agenda of the body over which the Mayor presides—now refuses direct communication with the elected Mayor, citing Ordinance No. 2026-17 by number.

98. On July 20, 2026, the Mayor transmitted to City Secretary Bravo, with Defendant Maria Hernandez copied, a formal written notice concerning the repeated refusal to place Mayor-requested items on the Council agenda, requesting identification of the legal authority relied upon,

the identity of the individuals who directed the refusal, copies of any supporting directives, and confirmation whether the practice had been applied to any prior Mayor. The same day, the Mayor separately requested that the agenda items he had placed before the Council—the thirteen items tabled at the June 22, 2026 Regular Meeting on Defendant Jimmy Hernandez's motion, seconded by Defendant Burton—be restored to the July 27, 2026 agenda.

99. Defendant Maria Hernandez initially responded on July 20, 2026 that "nobody is refusing to add your items to the agenda." The following morning, July 21, 2026, Defendant Maria Hernandez sent the Mayor her substantive answer: "*Most of the agenda items were tabled until the end of litigation*." Her email attached a list dividing the Mayor's items into two categories, captioned "Items Tabled until next regular meeting" and "Items Tabled until after litigation."

100. On July 23, 2026, Defendant Maria Hernandez confirmed the freeze in writing a second time, and identified its source and claimed authority: "As the City Administrator, I must follow directives from the Council. During the June 22 meeting, the Council gave a directive to table items 15, 18, 21, 22, 23, 24, 25, 26, 27, 29, 30, 31, and 32 until the litigation between the Mayor and the City has been completed. Councilman Hernandez made a motion to table these items; Councilman Burton seconded the motion and the motion passed by a majority vote of the council members." She continued: "This was the proper procedure for the majority of the City Council to override a decision of the presiding officer regarding the handling of the Council meeting. Please see Balcones Heights Code of Ordinances § 30.02(F)(5)." The City's position, stated in writing by a Defendant, is thus that the Council majority may, by "override" of the elected presiding officer, indefinitely remove the Mayor's matters from the governing body's agenda because—and for so long as—the Mayor is petitioning a federal court.

101. Separately, on July 20, 2026, the Mayor submitted to the City Administrator and City Secretary a formal written request for Council review of concerns regarding administrative neutrality, transparency, and the handling of Economic Development Corporation matters. Defendant Maria Hernandez's July 23, 2026 written response disputed the Mayor's account and stated that his email "will be placed as a future agenda item for discussion by the city council"—a placement with no date, while the Mayor's pending items remain frozen until the end of this litigation.

102. "Tabled until the end of litigation" is not a loose phrase in an email. It is, by the City's own account, a formal directive of the Council majority, adopted by recorded vote at the June 22, 2026 meeting and enforced by a Defendant. The thirteen frozen items include: the Mayor's request for Council review of the City's legal-representation arrangements and the conflict-of-interest issues arising from this very litigation (Item 15); an update on the $250,000 senior-citizens-center grant secured through the office of Congressman Joaquin Castro (Item 18); the Fiscal Year 2026–2027 City budget (Item 21); the Balcones Heights Police Collective Bargaining Agreement (Item 23); a complete financial accounting of the Tejano Music Fest (Item 24); the online public transparency portal (Item 25); review of Chapter 171 disclosure obligations in connection with the April 27, 2026 fire-department purchase vote (Item 26); and rescission of Resolution No. 2026-09R (Item 29), among others. None of those items is the subject of this litigation. The business of the City of Balcones Heights that its elected Mayor seeks to place before its governing body will not be heard, by formal directive of the Council majority, until the Mayor's federal civil rights case is over. That is retaliation for protected petitioning activity—adopted by recorded vote, confirmed in writing, and enforced by the Defendants themselves.

## X. Permanence, the Imminent Sanction Phase, and the Failure of Voluntary Cessation

103. Defendants' entire defense of the restrictions—in their briefing, at the May 1, 2026 preliminary-injunction hearing, and in their June 18, 2026 Answer—has been that the restrictions were "temporary procedures" protecting a pending investigation. That defense is now foreclosed by the Defendants' own legislative act. The investigation has concluded. The report has been received. And the restrictions, far from lifting, have been enacted as permanent law with an enforcement apparatus attached. Any suggestion that the challenged conduct has ceased, or will voluntarily cease, is refuted by Ordinance No. 2026-17's own text and by its active invocation against the Mayor in July 2026.

104. The sanction phase is imminent. The investigation report is in the Council's hands; the Council has adopted Resolution No. 2026-18R "accepting report and findings and authorizing issuance of corrective action, if necessary"; and on July 27, 2026 it adopted Resolution No. 2026-24R, staffing the complaint machinery in advance of any complaint, with the special-counsel selection to be reported "at the next available city council meeting." Ordinance No. 2026-17 arms the Council majority—the Mayor's litigation adversaries—with the machinery to convert that report into findings of "official misconduct in office," daily-accruing fines, attorney's-fee assessments, and access restrictions "more stringent" than the regime already in place, all adjudicated by the complainants' allies, with the accused excluded from the deliberation, no hearing required, and judicial review confined to a deferential substantial-evidence appeal. Plaintiff faces a concrete, particularized, and imminent threat of the application of this regime to him.

105. What the posted agenda foretold, the July 27, 2026 Regular Meeting delivered. On July 21, 2026—the same day Defendant Maria Hernandez confirmed in writing that the Mayor's agenda items were "tabled until the end of litigation"—the City posted the agenda for the July 27 meeting; none of the thirteen frozen items appeared on it. At the meeting, over the Mayor's on-the-record objection that the Council was purporting to exercise an authority over an elected official that Texas law does not confer, the Council adopted Resolution No. 2026-23R, "Declaring 'No Confidence' in Mayor Rodriguez," on the motion of Defendant Jimmy Hernandez, seconded by Mayor Pro Tem Lecea—Councilmembers Burton, Lecea, and Hernandez in favor, Councilmember Weaver opposed, and Councilmember Ebersole abstaining. The resolution's recitals—expressly "adopted as a part of the judgment and findings of the City Council"—fault the Mayor for, among other things, having "failed to recognize" the purposes of the personnel investigation and for "continu[ing] to disregard the will of the City Council." The Council then adopted Resolution No. 2026-24R—authorizing the Mayor Pro Tem and Defendant Maria Hernandez to select special counsel, and Defendant Hernandez to execute an engagement agreement, "to handle any complaints that may be filed pursuant to Ordinance No. 2026-17," with the selection to be reported "at the next available city council meeting"—by a 3–2 vote, Councilmembers Ebersole and Weaver opposed. The discussion laid the measure's purpose bare. When the Mayor asked, as presiding officer, what investigation the item referred to, Defendant Maria Hernandez identified the Mayor on the record as its subject—a statement subsequently revised to "any elected official"; Defendant Burton acknowledged that "there is currently no valid complaints under this ordinance"; and Defendant Jimmy Hernandez described the measure on the record as "another tool in the toolbox to get us ready." A governing body does not retain an investigator for anticipated complaints, name its anticipated respondent from the dais, and call the

apparatus a readied "tool" without revealing for whom the tool is intended. The same meeting took up, as a discussion item sponsored by Defendant Jimmy Hernandez, Councilmember Weaver's "comments and actions" at the June 22, 2026 meeting—the meeting at which she voted against Ordinance No. 2026-17—though no action was taken. And before the evening ended, Councilmember Weaver observed on the record that the conduct code the majority had just enacted was already being applied selectively: the accusations and personal attacks leveled from the dais that same night by Defendant Jimmy Hernandez had drawn no complaint and no penalty—"Where is the . . . $500 penalty for that?"

106. As a direct and proximate result of the conduct pled in Sections R through X, Plaintiff has suffered and continues to suffer, in addition to the harms pled above: (a) the threat of judicial sanctions for communicating with the staff of his own city; (b) the permanent codification of his exclusion from City Hall and his banishment to an office at a shopping mall; (c) the permanent subordination of his statutory functions to the discretion of a Defendant; (d) the codification of the gag order as municipal law; (e) exposure to an imminent Council-administered penalty proceeding carrying daily fines, fee-shifting, and a legislated finding of "official misconduct in office"; and (f) the freezing of his agenda submissions—the core of his participation in the governance of the City—expressly "until the end of litigation."

## IV. LEGAL FRAMEWORK

107. 42 U.S.C. § 1983 provides a federal remedy for the deprivation, under color of state law, of rights secured by the Constitution or laws of the United States. All Defendants acted under color of state law at all relevant times.

108. Municipal liability under § 1983 attaches when a municipal employee commits a constitutional violation pursuant to a municipal policy or custom. *Monell v. Dep't of Soc. Servs.*,

436 U.S. 658 (1978). The City Council is the City's final policymaker. *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986); *see* Tex. Loc. Gov't Code § 22.031(b) (governing body of a Type A municipality); *Thompson v. McGehee*, No. 25-10196, __ F.4th__, 2026 U.S. App. LEXIS 21235, at 31 (5th Cir. July 17, 2026) (recognizing that in Texas, "the board of aldermen is the governing body and thus the ultimate policymaker of a Type A municipality"). The void ordinances are official City policy—formally enacted by the final policymaker — and form the basis for *Monell* liability.

109. The First Amendment prohibits government officials from retaliating against individuals for engaging in constitutionally protected activity. *Hartman v. Moore*, 547 U.S. 250, 256 (2006). Elected officials are afforded robust First Amendment protection against retaliatory action by their colleagues. *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 478 (2022); *Bond v. Floyd*, 385 U.S. 116, 135–36 (1966); *Jenevein v. Willing*, 493 F.3d 551, 558 (5th Cir. 2007); *Gonzalez v. Trevino*, 602 U.S. 653 (2024). The Fifth Circuit, in *Thompson*, has just reaffirmed, on facts strikingly parallel to these, that a Texas municipal official states First Amendment retaliation and *Monell* claims where a municipal faction weaponizes official machinery against an elected official's protected speech and participation in governance.

110. This Court has previously applied these principles to enjoin retaliatory conduct by municipal officials against an elected official on materially analogous facts. *Bradshaw v. Salvaggio*, No. SA-20-CV-01168-FB, 2020 WL 8673836 (W.D. Tex. Oct. 28, 2020) (Chestney, M.J.), R&R adopted, 2020 WL 8673835 (W.D. Tex. Oct. 30, 2020) (Garcia, J.). The framework of *Bradshaw* controls here.

111. The structural invalidity of the challenged ordinances under Texas law is not a close question. Type A general law municipalities possess only those powers the Legislature has

expressly granted. Tex. Loc. Gov't Code § 51.001; *Town of Lakewood Village v. Bizios*, 493 S.W.3d 527, 535 (Tex. 2016). Section 51.012—in effect since the original 1987 enactment of the Code—voids any ordinance "inconsistent with state law," and operates as an express consistency cap on Type A municipal authority regardless of whether the asserted power is express or implied. The Legislature reinforced this longstanding consistency requirement with the 2023 enactment of § 51.002. The ordinances purport to draw their authority from § 22.072, which authorizes the council to prescribe duties of officers "whose duties are not specified by this code." § 22.072(b). Section 22.042 expressly specifies the Mayor's duties. The applicable subsection of § 22.072 is therefore (a), which authorizes the council to require an officer whose duties *are* specified to perform *additional* duties—not to subtract them. § 22.072(a).

## V. CAUSES OF ACTION

### COUNT I: 42 U.S.C. § 1983 — FIRST AMENDMENT RETALIATION
### (Against All Defendants)

112. Plaintiff incorporates all preceding paragraphs as if set forth fully herein.

113. **Legal Standard.** To establish First Amendment retaliation under § 1983, a plaintiff must show: (1) protected activity; (2) adverse action causing injury that would chill a person of ordinary firmness from continuing in that activity; and (3) substantial motivation by the protected activity. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Haverda v. Hays Cnty.*, 723 F.3d 586, 591–92 (5th Cir. 2013). The chilling-effect standard is calibrated to the elected-official context: a reasonable elected official acting in furtherance of statutory and constituent-representation duties. *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 478 (2022). The *Pickering-Garcetti* limitations on public-employee speech do not apply to elected officials. *Jenevein*, 493 F.3d at 558.

114. **Protected Activity.** Plaintiff engaged in constitutionally protected activity, including: his March 4, 2026 formal written directive demanding an investigation into the disappearance of approximately $12,000 in taxpayer-funded police equipment; his public statements at City Council meetings challenging the Council majority's conduct; his March 10 and March 14, 2026 formal written demands for clarification of the legal authority for the challenged ordinances; his exercise of statutory authority to call a Special Meeting of the Governing Body; his filing and continued prosecution of this federal civil rights action; his May 7 and May 11, 2026 submissions of items to the May 18, 2026 City Council agenda, including a constituent complaint concerning the use of City funds in connection with the campaign of Defendant Burton; his June and July 2026 submissions and re-submissions of agenda items to the governing body over which he presides; his July 20, 2026 formal written notice concerning the refusal to place his agenda items; his refusal to sign Ordinance No. 2026-17; and his ongoing performance of mandatory statutory duties under § 22.042.

115. **Adverse Actions.** Defendants took the following adverse actions, each of which would chill a reasonable elected official of ordinary firmness from continuing in protected activity, and which have in fact chilled Plaintiff: (a) Defendants Burton, Jimmy Hernandez, and Sellars enacted Ordinance Nos. 2026-09 and 2026-11; (b) Defendant Maria Hernandez deactivated Plaintiff's building entry access card and parking access code, and directed Police Chief Cavazos and Assistant Chief Nelms to confront and expel Plaintiff from the March 12 WOTA meeting under threat of arrest; (c) the City, through sworn law enforcement officers acting under color of state law, enforced the void ordinance by threatening to arrest the elected Mayor on city premises during the March 12, 2026 developer meeting; (d) Defendants Trevino and Maria Hernandez transmitted Ordinance No. 2026-09 to city employees with directives that all communications with

the Mayor be routed through Mayor Pro Tem Burton; (e) Defendant Burton signed Resolution No. 2026-08R and other official City documents with his signature block substituted for Plaintiff's; (f) the Council fast-tracked employment contracts at the March 23 meeting with Councilmember Hernandez stating on the record the express purpose was to protect city employees from the Mayor; (g) Defendant Maria Hernandez unilaterally retained Lloyd Gosselink without Council authorization and the investigator imposed an extrajudicial confidentiality directive on Plaintiff on April 22, 2026; (h) Defendant Sellars' April 27, 2026 motion to remove Plaintiff from office—an *ultra vires* act; (i) the City, through Defendants Maria Hernandez and Burton, on May 11, 2026 suppressed twelve agenda items submitted by Plaintiff for the May 18, 2026 City Council meeting, including a constituent complaint directed at Defendant Burton's own conduct; (j) the City's ongoing failure to provide Plaintiff with notice of official municipal events and meetings, including the June 11, 2026 EDC meeting of which Plaintiff received notice only after his own May 26, 2026 inquiry; (k) the City's June 3, 2026 cease-and-desist letter cataloguing thirty-four emails from the Mayor to city staff as "violations" and threatening judicial enforcement and sanctions against him; (l) the exclusion of the Mayor from the June 22, 2026 closed session, by 3–2 vote on Defendant Jimmy Hernandez's motion, on the stated ground that his interests were "averse to the City of Balcones Heights"; (m) the adoption of Resolution No. 2026-18R accepting the investigation's findings and authorizing the issuance of "corrective action, if necessary" against the Mayor; (n) the enactment of Ordinance No. 2026-17 on June 22, 2026—the same day the investigation that had justified the "temporary" restrictions concluded—codifying the restrictions as permanent law, installing Defendants Trevino and Maria Hernandez as the machinery of future investigations of the Mayor, codifying the gag order, and creating a penalty regime aimed at the Mayor; (o) the tabling, at the same June 22, 2026 meeting, of thirteen of the Mayor's agenda items

"until the litigation between the Mayor and the City has been completed," on the motion of Defendant Jimmy Hernandez, seconded by Defendant Burton, with Defendant Hernandez stating on the record that each item "was relevant to the Mayor's lawsuit and would therefore need to be tabled"; and (p) the refusal, in July 2026, to restore the Mayor's frozen agenda items to the July 27, 2026 agenda, on the written grounds—stated by Defendant Maria Hernandez on July 21 and July 23, 2026—that the items were "tabled until the end of litigation" pursuant to a Council directive and that Balcones Heights Code of Ordinances § 30.02(F)(5) authorizes the majority to "override" the elected presiding officer.

116. **Causation.** The adverse actions were substantially motivated by Plaintiff's protected activity, established by multiple independent grounds: (a) the six-day interval between the March 3 confrontation with Cavazos and the March 9 special meeting, and the five-day interval between the March 4 directive and that meeting—temporal proximity that is itself evidence of causation, *Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001); *cf. Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (very close temporal proximity between protected activity and adverse action is evidence of causality); (b) the coordinated simultaneous emergence on March 2, 2026 of both the Cavazos-insulation directive and the first-known complaints against the Mayor; (c) the City's own billing records—confirmed on the record by the City Attorney at the June 22, 2026 meeting to reflect "the investigation of complaints against the Mayor"—showing that the analysis of a complaint "received from election candidate," the preparation of a closed-session "internal investigation" agenda item, and the negotiation of a third-party investigator engagement were all under way between February 19 and February 26, 2026, before the March 2, 2026 date on which Resolution No. 2026-08R recites the City Administrator was "made aware" of employee complaints; (d) the self-interested nature of the complainants—subordinate

employees subject to the Mayor's mandatory § 22.042(b) oversight whose contracts were fast-tracked at the very meeting that stripped the Mayor's authority; (e) Councilmember Jimmy Hernandez's on-the-record statement at the March 23 meeting that the purpose of fast-tracking the employee contracts was expressly to protect those employees from the Mayor—direct evidence of retaliatory motive in the words of one of the Defendants; (f) the post-filing continuing acts: the April 27 Sellars removal motion, the May 7–13 agenda suppression specifically targeting a complaint about Defendant Burton, the May 18 meeting cancellation and fire-emergency notification failure, the May 26 EDC-notification failure, the June 3 cease-and-desist threat, and the ongoing imposition of the confidentiality directive; (g) the same-day sequence of June 22, 2026—the conclusion of the investigation that had been the sole asserted justification for the "temporary" restrictions and, at the same meeting, the enactment of those restrictions as permanent law—which refutes the asserted justification and lays bare the retaliatory purpose; (h) the June 22, 2026 Council directive—moved by Defendant Jimmy Hernandez, seconded by Defendant Burton, and confirmed in writing by Defendant Maria Hernandez on July 21 and July 23, 2026—tabling thirteen of the Mayor's agenda items "until the litigation between the Mayor and the City has been completed," with Defendant Hernandez stating on the record that each item "was relevant to the Mayor's lawsuit and would therefore need to be tabled"—an express admission that official action is being withheld from Plaintiff because of his protected petitioning activity in this Court; (i) the investigation executive summary's express reliance on Plaintiff's filing of this lawsuit as conduct substantiating its "retaliation" finding against him—the City's own commissioned investigation treating protected petitioning as punishable misconduct; and (j) the absence of any application of these measures to the Council majority itself, which has faced its own publicly raised allegations of misconduct without comparable consequences; and (k) the July 27, 2026 record itself:

Defendant Jimmy Hernandez's description of Resolution No. 2026-24R—the advance retention of special counsel for "any complaints" under Ordinance No. 2026-17—as "another tool in the toolbox to get us ready"; Defendant Maria Hernandez's on-the-record identification of the Mayor as the anticipated subject of that machinery; and the recitals of Resolution No. 2026-23R, adopted as the "judgment and findings of the City Council," faulting the Mayor for having "failed to recognize" the investigation's purposes and for "continu[ing] to disregard the will of the City Council"—the majority condemning the Mayor, in its own formal instrument, for maintaining his defense.

117. **Municipal Liability.** The City of Balcones Heights is liable under *Monell* because: (a) the City Council is the City's final policymaking authority; (b) the retaliatory conduct was carried out pursuant to official City policy—the void ordinances formally enacted by that body, including Ordinance No. 2026-17; and (c) the lockout, the March 12 arrest threat by sworn law enforcement officers acting on city direction, the communication ban, the document-signing usurpation, the employee contract fast-tracking, the agenda suppression, the cease-and-desist enforcement campaign, the unauthorized investigation, and the litigation-based agenda freeze were each carried out pursuant to and in implementation of those official policies. Where, as here, the retaliation is effected by the formal legislative enactments of the final policymaker itself, the policy requirement of *Monell* is satisfied in its paradigmatic form. *Cf. Thompson*, 2026 U.S. App. LEXIS 21235, at *27-32 (holding that retaliation claims against Texas Type A municipality proceed under *Monell* on allegations of an informal retaliatory custom; formal enactment presents the stronger case).

118. **Individual Defendant Liability.** Each individual Defendant in his or her individual capacity personally participated in the First Amendment retaliation as identified above.

Defendant Trevino personally participated through: presenting undisclosed allegations to the Council in the March 9 closed session; transmitting the void ordinances with enforcement directives; acknowledging procedural defects in writing while continuing enforcement; receiving explicit written notice on March 14, 2026 that the ordinances were void *ab initio* and taking no remedial action; drafting Ordinance No. 2026-11 citing a statutory provision that on its own terms cannot apply to the Mayor's office; and continuing to advise the Council majority on matters adverse to Plaintiff after becoming a named Defendant. These are implementation acts, not legal advice. Defendant Maria Hernandez personally participated through the acts pled above, including her July 21, 2026 written confirmation of the litigation-based agenda freeze.

119. **Damages.** As a direct and proximate result of the foregoing, Plaintiff has suffered reputational harm, emotional distress, mental anguish, humiliation, dignitary harm, and ongoing deprivation of his constitutional rights. Plaintiff is entitled to compensatory damages, nominal damages, punitive damages against individual Defendants in their personal capacities, injunctive and declaratory relief, and attorney's fees pursuant to 42 U.S.C. § 1988.

**COUNT II: 42 U.S.C. § 1983—FIRST AMENDMENT PRIOR RESTRAINT**
**(Against All Defendants)**

120. Plaintiff incorporates all preceding paragraphs.

121. In enacting, transmitting, and enforcing the void ordinances—and in imposing on Plaintiff the extrajudicial confidentiality directive, codifying that directive as permanent law in Ordinance No. 2026-17, and suppressing the agenda items he sought to place before the governing body—Defendants imposed impermissible prior restraints on Plaintiff's First Amendment rights to speak, petition, and assemble, in violation of 42 U.S.C. § 1983.

122. **Prior Restraint Doctrine.** A prior restraint is a governmental restriction imposed in advance of expression that prevents speech, assembly, or petition from occurring at all. *Near v.*

*Minnesota*, 283 U.S. 697, 713 (1931). Prior restraints bear a heavy presumption against their constitutional validity. This Court has previously found that a complete ban on an individual's presence at City Hall, imposed without procedural safeguards, constitutes an impermissible prior restraint. *Cuellar v. Bernard*, No. SA-13-CV-91-XR, 2013 U.S. Dist. LEXIS 43145, at *10–11 (W.D. Tex. Mar. 27, 2013).

123. **Theory One—Communication Ban as Complete Prior Restraint.** The ordinances prohibit the Mayor from any direct communication with any city employee, consultant, or the City Attorney without advance government permission—under Ordinance Nos. 2026-09 and 2026-11, the express written consent of the City Council; under Ordinance No. 2026-17, the authorization of the City Administrator or City Council. The purported routing channels—first through Mayor Pro Tem Burton, now through Defendant Maria Hernandez—are not alternative channels of speech; they are third-party intermediaries controlled by the Mayor's political and litigation adversaries. A licensing scheme conditioning expression on advance government permission is constitutional only if it operates under procedural safeguards designed to prevent censorship. *Collins v. Ainsworth*, 382 F.3d 529, 539 (5th Cir. 2004). The consent requirements contain no such safeguards: no defined criteria, no neutral decisionmaker, no time limit on consideration, no presumption of approval, no review mechanism, and no judicial check.

124. **Theory Two—Physical Access Bar as Prior Restraint.** Ordinance No. 2026-09 bars Plaintiff from City Hall except within 30-minute monthly windows tied to council meetings, and Ordinance No. 2026-17 § 2.5(C)(6) now permanently assigns the Mayor's "routine City business" to an office at the Wonderland of the Americas mall while §§ 2.5(A)(5)–(7) condition entry to secured city facilities on credentials the City has deactivated and escorts assigned by the Police Chief or the City Administrator. For an elected official whose statutory duties under

§ 22.042 require him to be physically present, this near-total exclusion is a prior restraint on his ability to exercise his First Amendment rights in the very building where those rights must be exercised to have meaning. *Cuellar*, 2013 U.S. Dist. LEXIS 43145, at *9–11.

125. **Theory Three—The Gag: From Extrajudicial Directive to Codified Law.** On April 22, 2026, the City—acting through outside counsel selected by Defendant Maria Hernandez—imposed on Plaintiff a written directive purporting to forbid the Mayor from discussing the City's investigation of him with anyone other than his attorney. On June 22, 2026, the Council codified that gag as permanent law: Ordinance No. 2026-17 § 2.6(A)(11) provides that the complaint, any response, and the investigation "cannot be discussed outside of a closed session by any person other than the City Attorney and special counsel"—enforceable against the accused elected official by daily fines, fee assessments, and a finding of "official misconduct in office." That is a content-based prior restraint on the speech of an elected officeholder on a matter of significant public concern, imposed without any judicial determination, now backed by a codified penalty regime, and asymmetrical by design: the City Attorney and the Council's chosen investigator may speak; the accused Mayor may not. The asymmetry is not hypothetical. On June 22, 2026, the Council selectively waived privilege over the investigation's executive summary by Resolution No. 2026-19R, directed City staff to post the report on the City's website, and a redacted version was subsequently provided to the press—while the Mayor remained gagged as to the same subject matter. The regime operates as a one-way valve: the government publishes its accusations against the elected official; the elected official is forbidden, on pain of daily fines and an "official misconduct" finding, from answering them.

126. **Theory Four—Agenda Suppression as Prior Restraint.** On May 11, 2026, the City, acting through Defendants Maria Hernandez and Burton, suppressed twelve items Plaintiff

sought to place on the May 18, 2026 City Council agenda—including a constituent complaint concerning Defendant Burton's own conduct—by pushing them to the June 2026 meeting via a communication routed through Defendant Burton. At the June 22, 2026 Regular Meeting, thirteen of the Mayor's items were then tabled by formal vote on Defendant Jimmy Hernandez's motion, seconded by Defendant Burton, "until the litigation between the Mayor and the City has been completed," and in July 2026 Defendant Maria Hernandez confirmed the freeze in writing—asserting that Balcones Heights Code of Ordinances § 30.02(F)(5) authorizes the Council majority to "override" the elected presiding officer. The Mayor's right to place items on the agenda of the body over which he presides is itself First Amendment-protected speech and petitioning activity. The suppression is viewpoint-discriminatory, is now expressly conditioned on the conclusion of Plaintiff's protected petitioning in this Court, and operates as a prior restraint without procedural safeguards.

127. **Theory Five—Informational Quarantine as Prior Restraint.** Following the May 7–13 agenda suppression sequence, Defendants have extended the routing regime to incoming information as well: as documented by the May 26, 2026 EDC communication and the July 17, 2026 Bravo transmittal invoking Ordinance No. 2026-17, the Mayor receives notice of municipal events only when he affirmatively inquires, and only through a Defendant-controlled intermediary. The systematic suppression of incoming official information—of meetings the Mayor presides over by statute, of fire emergencies in his own city, of EDC matters in which the City has a $5.4 million investment—is itself a restraint on the Mayor's ability to perform his protected speech functions as the elected presiding officer of the governing body.

128. **The "Temporary" Premise Is Now Conclusively Refuted.** Defendants repeatedly characterized the restrictions as "temporary"—in their briefing, at the May 1, 2026

hearing, and in their June 18, 2026 Answer. Ordinance No. 2026-11 was indefinite by its own "whichever occurs last" terms; Ordinance No. 2026-17 has now removed even the pretense. The investigation whose pendency was the asserted justification has concluded; the restrictions have been enacted as permanent law; and they are being enforced against the Mayor by name and by ordinance number.

129. **Viewpoint Discrimination.** The communication ban and the agenda-routing requirement do not regulate communication generally; as applied and as designed, they regulate the speech of one identified speaker—the Mayor—and route that speech through identified intermediaries who are his political and litigation adversaries. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *Wilson*, 595 U.S. at 478.

130. **Damages.** Plaintiff has suffered ongoing deprivation of his First Amendment rights, complete suppression of his official speech, reputational harm, emotional distress, and dignitary harm. Plaintiff is entitled to declaratory relief, injunctive relief, compensatory and nominal damages, and attorney's fees pursuant to 42 U.S.C. § 1988.

## COUNT III: 42 U.S.C. § 1983—FOURTEENTH AMENDMENT PROCEDURAL DUE PROCESS (Against All Defendants)

131. Plaintiff incorporates all preceding paragraphs.

132. **Legal Standard.** To establish procedural due process deprivation: (1) deprivation of a protected liberty or property interest; (2) without adequate process.

133. **Protected Interests.** Plaintiff has a property interest in the exercise of the powers and functions of his elected office, *Crowe v. Lucas*, 595 F.2d 985, 993 (5th Cir. 1979); a liberty interest in being in a public place of his choice, *City of Chicago v. Morales*, 527 U.S. 41, 54 (1999);

and a liberty interest in his reputation in connection with the governmental action publicly stripping him of his official functions, *Paul v. Davis*, 424 U.S. 693, 701 (1976).

134. **Process Due and Received—the March–June 2026 Deprivations.** Before depriving Plaintiff of these interests, due process required prior written notice of specific allegations; disclosure of complainants' identities; disclosure of evidence to be presented; an opportunity to respond; a neutral decisionmaker; and defined criteria. Plaintiff received none of these. Defendant Trevino personally presented the allegations in the March 9 closed session from which Plaintiff was excluded. Defendant Maria Hernandez was permitted to remain in that session while Plaintiff was excluded. The Council Defendants sat as interested parties rather than neutral decisionmakers. The subsequent Lloyd Gosselink "investigation"—initiated without lawful Council authorization, directed at its inception by a Defendant, and conducted under an extrajudicial gag order on the Plaintiff-Mayor—does not cure the lack of process; it compounds it.

135. **The Ordinance No. 2026-17 Penalty Regime—a Ripe, Imminent, and Structurally Deficient Process.** Ordinance No. 2026-17 §§ 2.6–2.8 now confront Plaintiff with an imminent adjudicatory proceeding that is structurally incapable of providing due process: (a) the intake authority for complaints is Defendant Trevino, a party adverse to Plaintiff in this litigation; (b) the investigating special counsel is recommended by Defendant Trevino, approved by Defendant Maria Hernandez, and operates "under the supervision of" Defendant Maria Hernandez—herself a complainant-in-interest and a Defendant; (c) the adjudicator is the City Council majority—Plaintiff's political adversaries and, as to several members, his litigation adversaries—sitting in judgment of the official they have spent five months restraining; (d) the accused official is excluded from the deliberations while no hearing is required; (e) an "intentional" violation is legislatively branded "official misconduct in office"—a stigmatizing determination

attaching to a sitting elected official, *Paul v. Davis*, 424 U.S. at 701; (f) the sanctions include fines of up to $500 per violation with each day constituting a separate violation, assessments of the City's attorney's fees, and access restrictions "more stringent" than the existing regime—deprivations of property imposed by a non-neutral body; and (g) judicial review is confined to a deferential substantial-evidence appeal of the interested body's own determination. The investigation report is in the Council's hands; the Council has adopted Resolution No. 2026-18R "authorizing issuance of corrective action, if necessary"; on July 27, 2026, the Council adopted Resolution No. 2026-24R authorizing the advance selection and engagement of the special counsel who will handle "any complaints that may be filed"—with Defendant Maria Hernandez stating on the record that the anticipated subject is the Mayor; the machinery is assembled, armed, and staffed; the threat of its application to Plaintiff is concrete, particularized, and imminent.

136. **Damages.** Plaintiff is entitled to compensatory and nominal damages, injunctive and declaratory relief, and attorney's fees pursuant to 42 U.S.C. § 1988.

## COUNT IV: 42 U.S.C. § 1983 — FOURTEENTH AMENDMENT SUBSTANTIVE DUE PROCESS / DE FACTO REMOVAL
## (Against All Defendants)

137. Plaintiff incorporates all preceding paragraphs.

138. **Legal Standard.** Substantive due process bars "certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Castille v. Port Arthur ISD*, 168 F.4th 240, 253 (5th Cir. 2026) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). Plaintiff "must demonstrate that the abuse of power by the state official shocks the conscience." *Id.* Conduct that shocks the conscience is conduct that "violates the decencies of civilized conduct"; "is so brutal and offensive that it does not comport with traditional ideas of fair play and decency"; "interferes with rights implicit in the concept of ordered liberty"; and "is so

egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Id.* at 253–54 (quoting *Doe ex rel. Magee v. Covington Cnty. Sch. Dist.*, 675 F.3d 849, 867 (5th Cir. 2012) (en banc)).

139. **This Case Is Categorically Different from *Castille* and the Run of Substantive Due Process Cases.** *Castille* involved a school district administrator who received pre-termination notice, a hearing examiner, an evidentiary hearing, and an administrative appeal to the Texas Commissioner of Education. 168 F.4th at 252–53. The Fifth Circuit held those facts did not surmount the "shock the conscience" bar. *Id.* at 253–54. This case is categorically different. Plaintiff is a sitting elected official; he has received no notice, no hearing, no neutral decisionmaker, and no opportunity to confront accusers. The conduct includes a threat of arrest by sworn law-enforcement officers for performing the duties his statutory office requires; physical confinement of an elected officer within a single room by city police on city premises; an extrajudicial gag order imposed on a sitting officeholder regarding a matter of significant public concern—since codified as permanent law; formal threats of judicial sanction for emailing city staff; suppression of his lawful agenda submissions, now expressly frozen "until the end of litigation"; a contemporaneous *ultra vires* motion to remove him from office outright; and the permanent legislative banishment of the elected Mayor's official functions to an office at a shopping mall. The conduct "extend[s] beyond mere violations of state law, even violations resulting from bad faith[,] to something more egregious and more extreme." *Castille*, 168 F.4th at 254.

140. ***De Facto* Removal Without Process.** Defendants have accomplished a *de facto* removal of Plaintiff from the Office of Mayor without invoking any lawful removal proceeding. Texas law provides an exclusive mechanism for removing an elected municipal officer—quo

warranto proceedings. *State ex rel. Angelini v. Hardberger*, 932 S.W.2d 489, 490 (Tex. 1996); Tex. Civ. Prac. & Rem. Code § 66.002. That mechanism has not been invoked and could not be successfully invoked on the facts presented. Defendants have instead used void ordinances, physical lockouts, arrest threats, a communication ban, an unauthorized investigation with an extrajudicial gag order, agenda suppression administered through political adversaries, a cease-and-desist campaign, an *ultra vires* removal motion, and—as of June 22, 2026—a permanent code of conduct with a Council-administered penalty regime, to achieve through raw power what they cannot accomplish through law or democracy.

141. **Functional Nullification of Elected Office—Now Permanent.** Plaintiff retains his title as Mayor-CEO. He has been stripped of every functional attribute of that office: he cannot enter City Hall on ordinary working days; his "routine City business" is assigned by ordinance to an office at the Wonderland of the Americas mall; he cannot communicate with city employees except through, and at the discretion of, a Defendant; he cannot obtain an in-person meeting with any staff member without a Defendant's written authorization; his statutory oversight duty has been legislatively redefined as the making of recommendations to the very officer he is charged with inspecting; his document-signing authority is exercised at the convenience of a Defendant; his ability to place items before the body over which he presides has been suppressed and is now frozen "until the end of litigation"; he is forbidden by codified ordinance from speaking about the investigation his political opponents initiated against him; and he faces an imminent Council-run proceeding empowered to brand him with "official misconduct in office" and fine him $500 per day. When the First Amended Complaint was filed, the nullification of Plaintiff's office was indefinite. As of June 22, 2026, it is permanent law. An elected official whose office has been legislated into a title without a function has been removed from office in every sense that matters.

142. **Damages.** Plaintiff is entitled to compensatory and nominal damages, injunctive and declaratory relief, punitive damages against individual Defendants in their personal capacities, and attorney's fees pursuant to 42 U.S.C. § 1988.

**COUNT V: SUPPLEMENTAL STATE LAW—TEXAS OPEN MEETINGS ACT**
**(Against All Defendants in Official Capacities)**

143. Plaintiff incorporates all preceding paragraphs. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

144. **TOMA Requirements.** The Texas Open Meetings Act requires all meetings of governmental bodies to be held pursuant to advance public notice that describes, with sufficient specificity, the subject matter to be discussed or acted upon. Any action taken in violation of TOMA is voidable. Tex. Gov't Code §§ 551.002, 551.041, 551.043, 551.102, 551.141.

145. **March 9, 2026 TOMA Violations.** The posted agenda for the March 9, 2026 Special Called Meeting did not identify any ordinance or resolution restricting the Mayor's powers, any legislative action concerning mayoral authority, or the Mayor by name as the subject of any charge. The closed session was cited in part to Texas Government Code § 551.072(2)—a real property provision—as partial authority for deliberations having nothing to do with real property. Defendant Jimmy Hernandez's own admissions at the March 23 meeting confirmed that direction was given in the March 9 closed session to select an investigative firm and regarding the substance of the legislative measure subsequently enacted—matters not properly noticed.

146. **The March 23, 2026 Meeting Did Not Cure the March 9 Defects.** Defendants have argued, and the Report and Recommendation accepted, that the March 23, 2026 regular meeting "ratified" the March 9 action and mooted any TOMA defect under *City of Combine v. Robinson*, No. 05-10-01384-CV, 2011 WL 3570510 (Tex. App.—Dallas Aug. 16, 2011, no pet.). The Dallas Court of Appeals—the same court that decided *Robinson*—subsequently limited that

holding in *City of Plano v. Hatch*, 584 S.W.3d 891, 901–02 (Tex. App.—Dallas 2019, no pet.). The *Hatch* court distinguished *Robinson* and held that a subsequent ratification does not moot a TOMA challenge where the plaintiff pleads that the ratification itself was the product of, or tainted by, TOMA violations. *Id.* at 902. Plaintiff has pleaded precisely that. By Defendant Jimmy Hernandez's own admissions on the record at March 23, direction was given in the March 9 closed session about both the substance of the ratifying ordinance to be enacted and the selection of the investigative firm—matters not properly noticed in the March 23 agenda. The March 23 ratification was itself the product of the March 9 closed-session deliberations that the TOMA challenge targets. *Hatch*, not *Robinson*, controls. Separately, the underlying substantive defects in the March 9 action—enactment of a void ordinance *ultra vires* under §§ 22.042, 22.072, and 51.012—cannot be cured by ratification in any event. A void act cannot be ratified.

147. **April 27, 2026 TOMA Violations.** The executive-session notice for the April 27, 2026 Regular Meeting was likewise defective. The cited consultation-with-attorney authority did not properly notice deliberations on the substantive findings or scope of the Lloyd Gosselink investigation. Defendant Trevino—a named Defendant in this federal litigation as of April 8—nonetheless participated in the closed-session discussions in disregard of her direct adversarial interest. Defendant Sellars' second motion to remove the Mayor from office, made at the April 27 meeting, was not properly noticed under any TOMA authority.

148. **June 22, 2026 TOMA Violations.** The posted agenda for the June 22, 2026 Regular Meeting designated the deliberations concerning the report of the personnel investigation of the Mayor for closed session under Texas Government Code § 551.071 (consultation with attorney) rather than § 551.074 (personnel matters). The deliberation of a third-party personnel investigation report concerning an identified officer is a personnel matter governed by § 551.074,

and the consultation-with-attorney exception cannot be used to launder personnel deliberations into closed session. Before the meeting, Plaintiff, through counsel, delivered a written demand pursuant to § 551.074(b)—which withdraws the personnel exception when "the officer or employee who is the subject of the deliberation or hearing requests a public hearing"—that the matter be heard in open session. Notwithstanding that demand, the certified minutes reflect that the Council entered closed session at 6:17 p.m. under the consultation-with-attorney notice; that the Mayor—the officer who is the subject of the personnel deliberation—was excluded from that session by a 3–2 vote on Defendant Jimmy Hernandez's motion; that no open hearing on the personnel matter was provided; and that immediately upon reconvening the Council adopted, as its first item of business, Resolution No. 2026-18R accepting the report and findings and authorizing corrective action, and then enacted Ordinance No. 2026-17—an ordinance the minutes reflect councilmembers had not been able to read "prior to Executive Session" because of "its relation to the ongoing legal case." The pattern reflects deliberation of both the personnel matter and the substance of the legislative measure in a closed session noticed only for attorney consultation, in violation of the Act, including § 551.074(b).

149. **Declaratory Relief Sought.** Pursuant to Tex. Civ. Prac. & Rem. Code §§ 37.001–011, Plaintiff seeks declarations that: (a) Ordinance No. 2026-09 is void *ab initio* under Tex. Loc. Gov't Code § 51.012 and voidable under TOMA; (b) Ordinance No. 2026-11 is void *ab initio*; (c) Ordinance No. 2026-17 is void *ab initio* under Tex. Loc. Gov't Code §§ 22.042, 22.072, and 51.012; (d) the March 9, 2026 legislative action is voidable for TOMA violations; (e) the City has not lawfully authorized the retention of Lloyd Gosselink Rochelle & Townsend, P.C.; (f) the April 22, 2026 confidentiality directive, and its codification in Ordinance No. 2026-17 § 2.6(A)(11) as applied to Plaintiff, are void and of no effect; (g) the April 27, 2026 closed-session deliberations

on the Lloyd Gosselink investigation and the Sellars removal motion are voidable for TOMA violations; and (h) the June 22, 2026 closed-session deliberations concerning the personnel investigation report and Ordinance No. 2026-17 are voidable for TOMA violations, and the actions taken thereon—including Resolution No. 2026-18R and Ordinance No. 2026-17—are voidable under Tex. Gov't Code § 551.141.

150. Plaintiff is entitled to attorney's fees as the prevailing party under Tex. Civ. Prac. & Rem. Code § 37.009.

## COUNT VI: SUPPLEMENTAL STATE LAW — ULTRA VIRES / TEXAS DUE COURSE OF LAW (Against Individual Defendants in Their Official Capacities)

151. Plaintiff incorporates all preceding paragraphs. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

152. **Ultra Vires Doctrine.** When a state official acts without legal authority, the official's action is not protected by governmental immunity and prospective injunctive relief is available. *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372–73 (Tex. 2009).

153. **Individual Ultra Vires Conduct.** (a) Defendants Burton, Jimmy Hernandez, and Sellars acted without legal authority in enacting Ordinance Nos. 2026-09 and 2026-11; (b) Defendant Sellars acted without legal authority in moving on April 27, 2026 to remove the elected Mayor from office; (c) Defendant Burton acted without legal authority in signing Resolution No. 2026-08R and other official City documents in the Mayor's stead, and in routing the disposition of the Mayor's agenda submissions through himself; (d) Defendant Trevino acted without legal authority in drafting Ordinance No. 2026-11 citing § 22.072 when that provision's applicable subsection—(a)—authorizes only the addition of duties to officers whose duties are specified by the Code, in continuing to direct enforcement after receiving explicit written notice on March 14, 2026 that the ordinances were void *ab initio*, and in continuing to advise the Council majority on

matters adverse to Plaintiff after becoming a named Defendant; (e) Defendant Maria Hernandez acted without legal authority in enforcing a physical lockout not authorized by the void ordinance, directing law enforcement to expel Plaintiff from his March 12 WOTA meeting, directing the communication ban, unilaterally retaining outside counsel to investigate Plaintiff without Council authorization, and suppressing the Mayor's lawful agenda submissions; (f) the enactment and enforcement of Ordinance No. 2026-17—an ordinance in direct conflict with Tex. Loc. Gov't Code §§ 22.042 and 22.072 and outside the § 51.012 consistency cap—are *ultra vires* acts void *ab initio*, and each individual Defendant who enforces or applies Ordinance No. 2026-17 against Plaintiff acts without legal authority; (g) Defendants Jimmy Hernandez and Burton acted without legal authority in moving and seconding, and the Council majority in adopting, the June 22, 2026 directive tabling the Mayor's thirteen agenda items "until the litigation between the Mayor and the City has been completed"—no statute or ordinance authorizes the withholding of the governing body's business in retaliation for protected petitioning; and (h) Defendant Maria Hernandez acted without legal authority in enforcing that freeze and in asserting, in writing, that Balcones Heights Code of Ordinances § 30.02(F)(5) authorizes the Council majority to "override" the elected presiding officer's agenda indefinitely on account of pending litigation.

154. **Texas Due Course of Law.** Article I, Section 19 of the Texas Constitution prohibits the deprivation of a citizen's privileges or immunities without due course of law. The objective inconsistency—applying these extraordinary measures to an elected Mayor performing mandatory statutory duties while no comparable measures were applied to the Council majority for its own alleged violations—demonstrates the arbitrariness abhorrent to due course of law.

155. **Relief.** Plaintiff is entitled to prospective injunctive relief against each individual Defendant in their official capacity, including: restoration of full access to City Hall; restoration

of direct communication rights; restoration of document-signing authority; restoration of the Mayor's right to place items on the Council agenda directly; nullification of the April 22, 2026 confidentiality directive and of Ordinance No. 2026-17 § 2.6(A)(11) as applied to Plaintiff; and an injunction prohibiting enforcement of Ordinance Nos. 2026-09, 2026-11, and 2026-17. To the extent the declaratory relief sought in Count V is granted, Plaintiff is also entitled to attorney's fees as the prevailing party under Tex. Civ. Prac. & Rem. Code § 37.009.

## VI. DAMAGES

156. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered: (a) reputational harm from the public nature of the retaliatory conduct; (b) emotional distress, mental anguish, humiliation, and dignitary harm; (c) ongoing chilling and suppression of his constitutional rights; and (d) all other actual damages proven at trial.

157. Plaintiff is entitled to nominal damages for each constitutional violation.

158. Plaintiff is entitled to punitive damages against individual Defendants in their personal capacities.

## VII. CONDITIONS PRECEDENT

159. All conditions precedent have been performed, have occurred, or have been waived. Plaintiff made formal written demands through prior counsel on March 10, March 14, and March 24, 2026. Plaintiff has, through counsel and personally, demanded production of the City Council action authorizing the Lloyd Gosselink retention and the lifting of the confidentiality directive, including on May 26, 2026; those demands have not been honored. Plaintiff delivered a written § 551.074(b) demand before the June 22, 2026 meeting, and delivered formal written notice on July 20, 2026 concerning the refusal to place his agenda items.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Johnny A. Rodriguez, Jr. respectfully prays that this Court:

A. Issue a preliminary and permanent injunction restoring Plaintiff's full access to City Hall and all municipal facilities; restoring his right to communicate directly with city employees, the City Attorney, and city consultants; restoring his document-signing authority as chief executive officer; restoring his ability to place items on the Council agenda directly; nullifying the April 22, 2026 confidentiality directive; and restraining Defendants from enforcing Ordinance Nos. 2026-09, 2026-11, and 2026-17 or taking any action pursuant to their purported authority, including any complaint, investigation, adjudication, sanction, or penalty proceeding against Plaintiff under Ordinance No. 2026-17 §§ 2.6–2.8;

B. Enter a declaratory judgment that Ordinance Nos. 2026-09, 2026-11, and 2026-17 are void *ab initio*; that the physical lockout is unlawful and unauthorized; that the City has not lawfully authorized the retention of Lloyd Gosselink Rochelle & Townsend, P.C.; that the April 22, 2026 confidentiality directive, and Ordinance No. 2026-17 § 2.6(A)(11) as applied to Plaintiff, are void and of no effect; and that Plaintiff retains the full statutory authority of the Mayor-CEO of the City of Balcones Heights;

C. Award Plaintiff compensatory damages against Defendants for reputational harm, emotional distress, mental anguish, humiliation, and all other actual damages proven at trial;

D. Award Plaintiff punitive damages against the individual Defendants in their personal capacities;

E. Award Plaintiff nominal damages for each constitutional violation;

F. Award Plaintiff reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988 on his federal claims (Counts I–IV), and pursuant to Tex. Civ. Prac. & Rem. Code § 37.009 on the declaratory relief granted on Count V;

G. Award pre-judgment and post-judgment interest as allowed by law; and

H. Grant such other and further relief as this Court deems just and proper.

Respectfully Submitted,

**GRABLE PLLC**

*/s/ Brandon J. Grable*
**Brandon J. Grable**
Texas State Bar No. 24086983
brandon@grable.law
12451 Starcrest Drive, Ste 206
San Antonio, Texas 78216
Telephone: (210) 963-5297
Facsimile: (726) 215-4765
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that on the 11th day of August, 2026, a true and correct copy of the foregoing was served upon all counsel of record via the Court's CM/ECF system.

*/s/ Brandon J. Grable*
Brandon J. Grable